David KEND, Appellee,

v.

CHROMA–GLO, INC., Appellant.

No. 72–1389.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1973.

Decided April 20, 1973.

Raymond L. Erickson, Duluth, Minn., for appellant.

Robert E. Goldman, New York City, for appellee.

Before GIBSON and ROSS, Circuit Judges, and BENSON,* District Judge.

BENSON, District Judge.

A judgment for the plaintiff (appellee) for the sum of $51,597.27 was entered on a jury verdict in a diversity action brought in the United States District Court for the District of Minnesota. This is an appeal from the judgment and from the order of the court denying defendant's (appellant's) motion for judgment notwithstanding the verdict, or in the alternative, for a new trial.

In June, 1966, Appellee David Kend (Kend), experienced in the name plate industry, contacted Appellant, Chroma-Glo, Inc. (Chroma-Glo), and expressed an interest in the company and its operations. Kend was particularly interested in Chroma-Glo's production of a mylar sign which closely resembled metal signs, but which fabricated very much like paper and didn't require expensive tooling or heavy equipment.

At an August 31, 1966, meeting with the Board of Directors of Chroma-Glo, Kend learned that Cole National Corporation (Cole) was interested in a type of Mylar numeral or letter sign bonded to a rigid aluminum backing. The purpose of the aluminum backing was to prevent the sign from curling. Chroma-Glo could not produce such a product with its existing equipment. Its capital picture was such that it was not in a position to secure additional equipment without financial assistance. Kend suggested that perhaps Cole could be sold a sign with a paper or cardboard backing which would satisfy Cole's requirements and could be produced with Chroma-Glo's equipment. It was agreed that Kend would represent Chroma-Glo on a commission arrangement in efforts to sell to Cole.

On September 7, 1966, Kend wrote Chroma-Glo:

". . . confirming our verbal arrangement, I am going to pursue the 'Cole National' project to a conclusion. I will cover all bases both in New York and Cleveland towards concluding a contract with them. As I progress I will be in touch with you to make sure our figures and proposals are sound. You have advised me that Chroma-Glo, Inc. will protect me with your standard commission arrangement in the event that I am successful in selling this account. This commission will be paid for any sales made to this company, whether or not we conclude a long term arrangement."

The president of Chroma-Glo responded on September 23, 1966:

". . . I'm anxious to hear from you on our potential business from

Cole National Corp. and you have our assurance that you would receive for your efforts the commissions and per cent of over charge over price list as we had discussed it."

On November 8, 1966, Kend made a presentation to Cole of Chroma-Glo gold and black cardboard mounted letters. Cole was impressed with the cardboard backing feature, and asked for an immediate quotation on black and white similarly mounted letters. Additional presentations with price quotations were made. It appeared an order would be forthcoming and on December 19, 1966, Kend brought a Cole representative to inspect Chroma-Glo's production facilities and wrote Chroma-Glo:

"Confirming my arrangement with you, you will cover me with a commission on this program which represent the difference between your quoted price to me of .035 cents each and the selling price to Cole of .039 cents each. On the tooling I will be covered on the difference between the quoted price to me of $400 and the quoted price to Cole of $630. On all future items which we quote to Cole, I will be protected by you with a commission percentage in the same amount (10%) which we had established on this initial program."

Following the plant inspection, Cole began placing orders with Chroma-Glo for black and white cardboard backed numerals and some eighteen months after the initial black and white order, placed orders for black and gold cardboard backed numerals. Altogether, Cole placed orders totalling $728,364.80.

At about the time Cole began placing its orders, Kend, with Chroma-Glo's knowledge, became associated with Dura Process Company, a competitor of Chroma-Glo. He continued to negotiate with Cole regarding the full marketing program of Chroma-Glo letters, numerals and signs of various color combinations. With reference to the Cole business, Chroma-Glo wrote Kend on February 8, 1967:

"If they wish, they can select any color combination such as olive drab, red, etc., for sale to certain customers such as Bell Telephone Company who uses approximately an olive drab. This would cause no difficulty whatever on our part, provided the quantities were fairly substantial. A color change creates no need whatever in the equipment required to make these parts."

In March of 1967, during which time Kend testified he remained in contact with Cole on behalf of Chroma-Glo, samples of the mylar numerals were sent to Cole, accompanied by a letter dated March 27, from Mr. Erickson, which stated in part:

"David Kend will see you at your convenience to discuss the price quotations on all of these parts and he will cover with you at the same time the various points and possible changes you may require."

Mr. Kend testified that he subsequently quoted prices to Cole, including prices on gold and black, in April of 1967. It appears that Mr. Kend corresponded with Cole in May of 1967, as to the progress of field testing of Chroma-Glo samples sent in February.

However, it was not until March of 1968, that Cole indicated to Chroma-Glo that it was interested in placing an order for the black and gold numerals. Chroma-Glo did not communicate this information to Kend, and in June, 1968, Cole made substantial purchases of the black and gold numerals. When Kend learned of this purchase, a dispute arose as to whether Kend was entitled to a 10% commission on the black and gold sale.

Chroma-Glo has stated the issues presented for review to be:

"1. Did the trial court err in refusing to instruct the jury that where words or other manifestations of intention bear more than one meaning an interpretation is preferred which operates more strongly against the party using

them, as had been requested by the appellant, Chroma-Glo, Inc.?

2. Did the trial court err in refusing to instruct the jury as to the legal meaning of "procuring cause," as had been requested by the appellant?

3. Did the facts sufficiently support the jury's finding that the appellee, David Kend, was the procuring cause of the sales of the Black and Gold series to Cole National Company?"

Appellee stated a cause of action in his complaint on a theory of exclusive and continuing agency which would entitle him to a commission on all future Chroma-Glo sales to Cole, and demanded judgment accordingly.

In the trial of the case, and as argued to the jury, the parties, in effect, narrowed the issue to whether Kend was entitled to a 10% commission on the sale of black and gold numerals.

■ The evidence supports the trial judge's view of the dispute as expressed in his post trial memorandum:

"Over the years defendant sold Cole National some three-quarters of a million dollars worth of its product. It was some two years after Cole National first ordered black and white that it placed an order for black and gold and it is the 10% commission on these sales in the amount of $339,065.86 or a total of $33,906.58 that is in dispute. Defendant admits that on sales of black and white in the amount of $389,334.76 it has only paid $21,242.78 and still owes $17,690.69."

Although the evidence does establish that the parties did not disagree on the rate of the commission, it is insufficient to establish an exclusive and continuing agency which would entitle the appellee to commissions on all future sales by Chroma-Glo to Cole. On the state of the record at the time the case went to the jury, the determinative issue was whether the appellee was the procuring cause of the sale of the black and gold letters.

On that issue, the appellant's requested instruction on the rule for the interpretation of ambiguous contracts was obviously not appropriate, and it was not error for the trial court to deny the request.

■ Appellant requested the following instruction on procuring cause:

"To be the procuring cause of a sale, a broker must originate a cause of events, which without break in continuity make a cause of which the sale is the result. It is not enough that you find the plaintiff's services merely contributed to the ultimate sale, his services must have been the procuring and effective cause. If you find that the agency of Mr. Kend was terminated or that he abandoned performance or ended his negotiations with Cole National Company before a sale was made, then he would not be the procuring cause thereof."

The trial court's instruction on procuring cause reads:

"Now under our system of law in this country, parties are generally free and competent to agree to whatever terms of a contract they may wish or desire, so long as it is lawful. Now if such an agreement is found, that controls. Absent such an agreement, however, and if there be no such agreement found, an agent whose compensation is conditioned upon his accomplishment of a specific result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result."

■ Minnesota follows the general rule that a broker or agent, where the agency created is non-exclusive,

"is not entitled to a commission unless he was the procuring cause of the sale; that is, it must have been the direct result of his efforts to bring it about, and a broker [or agent] seeking to recover a commission has the burden of proving this affirmatively." Rees-Thompson-Scroggins, Inc. v. Nelson, 276 Minn. 453, 150 N.W.2d 568,

571 (1967), citing Neumeier v. Sperzel, 223 Minn. 60, 64, 25 N.W.2d 651, 653 (1946).

Appellant contends that his requested instruction on procuring cause must be given to be in accordance with the pronouncements of the Supreme Court of Minnesota, in *Neumeier* and *Rees-Thompson-Scroggins, Inc.*

■ Generally, words which are of significance in their ordinary or popular meaning need no further legal explanation. "Effective", used as an adjective, is capable of such meaning and needs no legal explanation. Webster's Third International Dictionary, 724 (1967) states that the word comes from effectivus, latin, the past participle of *efficere* meaning to bring about, accomplish or effect. "Capable of bringing about an effect: productive of results" is the primary meaning given. "Effectual [a synonym of effective] may apply to what has accomplished an intended result and may approach connotations of *decisive.*" Webster's, p. 724. "Effective cause", in the context of this case, would connote, in ordinary meaning, the primary or decisive cause of the desired result for which Kend was obtained—to sell Chroma-Glo's products to Cole National. The given instruction to the jury would convey the concept that Kend could not receive a commission unless he brought about the sale of the black and gold series to Cole National through his efforts. Effective cause, as used in ordinary or popular language portrays a certain exclusiveness in that there cannot be two effective causes, no more than there can be two "procuring causes."

The Supreme Court of South Dakota set forth the two "approaches" to justifiable commissions without distinguishing between them:

"A number of the cases digested in 34 Words and Phrases, phrase the definition of 'procuring cause' substantially in terms as one originating a series of events which without break in their continuity, result in the accomplish-ment of the prime object of the broker's employment."

"The Restatement employs the phrase 'effective cause' and states, 'An agent is an 'effective cause' as that phrase is used in this Section, when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him, so that it is just that the principal should pay the promised compensation to him." Mehlberg v. Redlin, 77 S.D. 586, 96 N.W.2d 399, 401 (1959).

Actually there is no distinction between the two approaches as both focus upon compensation of one who accomplishes the object of his agency. A perusal of Minnesota cases not only emphasizes this, but also makes clear the Supreme Court of that State did not require the "without break in continuity" language to be included in all instructions on the subject. The primary concern of the Minnesota law is the protection of the principal against multiple claims for commissions on any one transaction. *See* Carney v. John Hancock Oil Co., 187 Minn. 293, 245 N.W. 367 (1932).

While *Rees-Thompson-Scroggins, Inc.* emphasized the "without break in continuity language," that court also stated:

". . . *The test is whose efforts tipped the scale* and induced the owner and purchaser to come to agreeable terms." 150 N.W.2d at 571. (Emphasis added).

■ Here, the evidence clearly established that Cole was initially interested in letters bonded to rigid aluminum backing which Chroma-Glo couldn't produce. The Chroma-Glo to Cole sales of black and white and black and gold numerals was brought about by Kend's expertise and efforts in demonstrating to Cole that numerals on cardboard backing would satisfactorily meet Cole's requirements. In this case the time lapse on the black and gold sales was therefore of no significance on the issue of whose efforts tipped the scale or who was the procuring or effective cause.

We deem it unlikely that a modification of the instruction as suggested by Chroma-Glo would have changed the jury's verdict. Lynch v. Traveler's Indemnity Company, 452 F.2d 1065 (8th Cir. 1972).

There was no error in the instructions, and the evidence is sufficient to support the verdict.

Affirmed.