**James M. RADDATZ, d/b/a Raddatz Real Estate, Respondent,**

v.

**NORTHLAND DEVELOPMENT CO. OF MINNEAPOLIS, INC. and Northland Park Partnership, Appellant.**

**No. C7–83–1757.**

Court of Appeals of Minnesota.

July 24, 1984.

Review Denied Oct. 11, 1984.

■■■■■■■■■■■■■■■■

———————

Donald J. Fraley, Wayzata, for respondent.

Leo B. Stern, Fredrikson & Byron, P.A., Minneapolis, for appellants.

Heard, considered and decided by FOLEY, P.J., and SEDGWICK and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Northland appeals from a judgment awarding James Raddatz a real estate broker's commission upon a completed lease. Northland contends the trial court erred by directing the jury that the parties had an enforceable written listing agreement and that Raddatz had earned a commission under the agreement. Northland also contends the court erred by calculating the judgment without regard to a stipulated set off for services Northland provided to Raddatz. We affirm.

## FACTS

Northland owns Northland Park, an industrial park in Brooklyn Center. In 1977 Northland hired Raddatz to head its marketing efforts and to work with outside brokers. Under the oral agreement, Raddatz received a 20 percent override on commissions earned by outside brokers. He received free office space, supplies and secretarial services, and membership in Northland's sports and health club. Raddatz also received commissions for sales and leases he arranged.

### Written Listing Agreement

The trial court instructed the jury that a real estate brokerage commission schedule prepared and distributed by Northland to brokers was the listing agreement between the parties. From 1977 through 1979 Northland paid Raddatz more than 60 commissions according to the terms of the schedule.

James Stuebner, president of Northland, argued that the schedule was merely advertising used to let the brokerage community know that Northland pays commissions to outside brokers. He said Northland uses written listing agreements, but could not recall any particular written listing agreements Northland had with outside brokers.

### Performance to Earn Commission

Raddatz's involvement with the Network Systems deal is clear. He registered Network Systems with Northland as a prospective tenant to preclude anyone else from collecting a commission on a lease signed by the company. He made the initial contact and arranged for Network Systems officials to tour Northland Park. After the first few meetings Stuebner took over the protracted planning and negotiations which eventually culminated in Network Systems signing a "build to suit" lease. Stuebner told Raddatz he would take over the final negotiations at that point, and there was no claim by appellant that Stuebner took over the negotiations because Raddatz had not done something he was supposed to have done.

The commission schedule specifies that Northland pays full commissions for introductions. It provides:

> Unlike many commercial and industrial parks, Northland park does not maintain its own sales staff to the exclusion of independent, experienced real estate brokers. We pay *full* commissions to brokers that introduce clients to us even though Northland's design, engineering and executive staff may become deeply involved in planning the client's building and closing the sale. Under those circumstances, we do not believe in discounting a full commission to a "Finder's Fee."

Raddatz testified and an outside broker confirmed that Northland has paid brokers commissions for nothing more than an introductory telephone call where the prospect eventually signed a lease.

Stuebner testified that Raddatz worked "under the same ground rules" as outside brokers in earning commissions. He said that to earn a commission from Northland a broker had to procure the tenant, bring him to the park, show him the space and be responsible for execution of the lease. He said Northland denied Raddatz the commission because of Stuebner's own extensive involvement in the Network Systems deal. The record supports no inference that Northland could deny or cut down on earned commissions by voluntarily interjecting themselves into the lease negotiations with prospective tenants.

Stuebner conceded Raddatz was entitled to some commission in a letter to Raddatz. The letter stated:

> Dave asked me yesterday if there was a commission due on the Network Systems lease to you, since he knew that you had been involved in the early negotiations on this deal. I told him I felt there was but in reviewing my files, I cannot find that we ever discussed the exact amount of the commission to be involved.

### ISSUES

1. Did the trial court err in directing the jury that the parties had an enforceable written listing agreement and that Raddatz had earned a commission under the agreement?

a. Was the commission schedule the listing agreement between the parties?

b. Did Raddatz earn a commission under the terms of the listing agreement?

c. Does the commission schedule satisfy the requirements of Minn.Stat. § 82.-33 (1978)?

2. Did the trial court err by calculating the judgment without regard to a stipulated set off for services provided to Raddatz by Northland?

### ANALYSIS

#### I.

A court should grant a directed verdict only in those cases where:

(1) in light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case. Despite the fact that a motion for a directed verdict admits for the purposes of the motion the credibility of the evidence for the adverse party and every inference which may be fairly drawn from such evidence, *a court should direct a verdict in favor of the party in whose favor the evidence overwhelmingly preponderates even though there is some evidence in favor of the adverse party.* Not every conflict in the evidence gives rise to a jury question.

*J.N. Sullivan & Assoc. v. F.D. Chapman Const.*, 304 Minn. 334, 336, 231 N.W.2d 87, 89 (1975) (emphasis added).

#### I(a)

■ Northland contests the existence of a written agreement between the parties. The company argues that Raddatz's oral employment contract, not the commission schedule, governed dealings between the parties. According to Northland, the schedule is merely advertising aimed at outside brokers rather than Raddatz. Moreover, the company claims the schedule is too indefinite to be treated as an offer accepted by performance.

If Stuebner's testimony about the schedule were considered in a vacuum it would be sufficient to raise a jury question. However, Stuebner admitted that Raddatz operated under the same ground rules as outside brokers in earning commissions. Northland used the commission schedule as a listing agreement with outside brokers. It paid Raddatz more than 60 commissions according to the terms of the schedule. The evidence establishes that the schedule was the listing agreement between the parties.

#### I(b)

Northland contends that even if there was an agreement Raddatz did not earn a

commission because he was not the procuring cause of the lease. The company argues that because Stuebner took over the negotiation Raddatz is not entitled to a commission.

■ In the absence of an agreement to the contrary, a broker is entitled to a commission only if he was the procuring cause of the sale. *Kend v. Chroma-Glo*, 478 F.2d 198, 201 (8th Cir.1973). However, parties may contract for lesser performance. *Sheehy v. Bodin*, 349 N.W.2d 353, 354 (Minn.Ct.App.1984). The terms of the contract govern. A broker is entitled to a commission when he has performed everything he undertook to perform under his agreement with the seller. *McDonald v. Stonebraker*, 255 N.W.2d 827, 829 (Minn. 1977)

■ The listing agreement between Northland and Raddatz did not require Raddatz to be the procuring cause of the Network Systems lease; it required only that he "introduce" the client to Northland. Northland concedes that Raddatz made the first contact with Network Systems, and brought the Network Systems officials to the park to show them around. The company has paid commissions to outside brokers for much less. Furthermore, Stuebner admitted in writing that Raddatz was entitled to some commission on the deal. This evidence establishes that Raddatz earned a commission under the terms of the agreement.

### I(c)

Finally Northland contends that Raddatz is not entitled to a commission because the schedule is unenforceable under Minn.Stat. § 82.33 (1978). The statute provides:

> Subd. 2. No person required by this chapter to be licensed shall bring or maintain any action in the courts for any commission, fee or other compensation with respect to the sale, lease or other disposition or conveyance of real property, or with respect to the negotiation or attempt to negotiate any sale, lease or other disposition or conveyance of real property unless such property was first listed in writing for sale, lease or other disposition with the person bringing or maintaining the action.

■ The statute is to be strictly construed to prevent overreaching claims by brokers on the basis of uncertain, contradictory or perjured testimony. But it is not a license for real estate vendors to avoid paying for contracted brokerage services when the broker has substantially performed under the contract.

■ The commission schedule at issue specifies the types of transactions for which Northland pays commissions, the performance required to earn commissions, and the rates of compensation. Northland paid Raddatz over 60 commissions under the terms of the schedule before raising the question of compliance with Minn.Stat. § 82.33. Under the facts of this case we hold that the commission schedule substantially complies with the requirements of the statute.

We note that Minnesota Rules, Chap. 2800.3800 (1982) (formerly 4 MCAR § 1.41519), interpreting Minn.Stat. § 82.33, do not apply to this case as their effective date was later. Therefore we do not answer the question of whether the commission schedule satisfies the new regulations.

### II.

■ Northland also objects to the court's failure to award the stipulated set off for services Northland provided to Raddatz. However, the company presented evidence at trial that the services were compensation for Raddatz's marketing efforts on its behalf. In light of the contradictory evidence, the trial court could reasonably disregard the stipulation and decide this question on the evidence as a whole.

### DECISION

We affirm.