UNITED STATES of America,
Plaintiff, Appellee,

v.

RULE INDUSTRIES, INC., et al.,
Defendants, Appellants.

No. 88–1797.

United States Court of Appeals,
First Circuit.

Heard March 1, 1989.
Decided June 22, 1989.

Jerome P. Facher with whom Thomas N. O'Connor and Hale and Dorr, Boston, Mass., were on brief for defendants, appellants.

Jeffrey S. Robbins, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and FUSTE,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Pursuant to a contract with the General Services Administration ("GSA"), defendant Rule Industries, Inc. ("Rule") supplied the United States government with hack-

---

* Of the District of Puerto Rico, sitting by designa-tion.

saw blades. Rule had certified in the contract that the hacksaw blades were "domestic end products" for purposes of the Buy American Act, 41 U.S.C. §§ 10a–10c (1982 & Supp. V 1987) and the regulations implementing the Act, 48 C.F.R. pt. 25.1 (1987). Alleging this certification was false, the government brought this action for penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (Supp. V 1987), against Rule, its president, and its general manager. A jury found that the hacksaw blades were not domestic end products and that Rule's contrary certification was knowingly false. Defendants appeal from the denial of their motions for a directed verdict and their motions for a judgment notwithstanding the verdict, as well as the district court's refusal to give defendants' requested jury instructions. We affirm.

## I. BACKGROUND

During 1981 and 1982, GSA solicited bids for various kinds of high speed steel hacksaw blades. In soliciting these bids, GSA was required to comply with the Buy American Act, which provides in pertinent part:

> Notwithstanding any other provision of law, and unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, ... only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials or supplies mined, produced, or manufactured, as they case may be, in the United States, shall be acquired for public use....

41 U.S.C. § 10a.

Consequently, the "Solicitation, Offer and Award" contract form issued by GSA, which embodied the contract between the winning bidder and GSA, contained the following "Buy American Act" certification:

> The offeror certifies as part of his offer that: each product, except the products listed below, is a domestic end product (as defined in the clause entitled "Buy American Act"), and that components of

unknown origin have been considered to have been mined, produced or manufactured outside of the United States.

A box entitled "Excluded End Products" and a space for "Country of Origin" followed the certificate. The clause entitled "Buy American Act" provided in pertinent part:

> In acquiring end products, the Buy American Act (41 U.S.C. § 10a-d) provides that the Government give preference to domestic source end products. For the purpose of this clause:
>
> (i) "Components" means those articles, materials, and supplies, which are directly incorporated in the end products;
>
> (ii) "End products" means those articles, materials, and supplies, which are to be acquired under this contract for public use; and
>
> (iii) A "domestic source end product" means ... an end product manufactured in the United States if the cost of the components thereof which are mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components....

The definitions provided by this clause for "components" and "end products," as well as the "50 percent test" for "domestic end products," are found in the Federal Acquisition Regulations, 48 C.F.R. § 25.101. The terms of the "Solicitation, Offer and Award" further provided that "bids under this solicitation offering domestic source end products normally will be evaluated against bids offering other end products by adding a factor of fifty percent (50%) to the latter...."

Rule was the winning bidder, entering into four contracts to supply GSA with 10 and 12 inch length high speed steel hacksaw blades. Two contracts covered the period November 1981 through November 1982, and two covered the period December 1982 through November 1983. In each of these contracts, Rule certified that the hacksaw blades were "domestic end products"; the space for exceptions to the Buy American Act was left blank. Thus, taking into account the language of the "Buy American Act" clause in the contract, Rule

certified that the hacksaw blades were manufactured in the United States and that the cost of the hacksaw blades' components (*i.e.*, those articles, materials and supplies "directly incorporated" into the hacksaw blades) mined, produced or manufactured in the United States exceeded 50 percent of the cost of all of the hacksaw blades' components. Because Rule certified that its hacksaw blades were domestic end products, the 50 percent markup was not applied to its bid.

The hacksaw blades subsequently supplied to GSA under these contracts were produced as follows:

1. *Hacksaw Blanks.* Rule purchased "hacksaw blanks" from Fagersta, Inc., a Swedish company, and Hitachi Metals, a Japanese company. Hacksaw blanks are thin strips of steel cut from coil steel. They are rounded at each end, and holes are punched into both ends of the blank. The general dimensions of the blanks are essentially the same as the finished product, the hacksaw blade. The hacksaw blanks that were used to make the hacksaw blades in this case were made in either Sweden by Fagersta or in Japan by Hitachi Metals.

2. *Milling.* After purchasing the hacksaw blanks from Fagersta and Hitachi, Rule milled the blanks at its plant in Gloucester, Massachusetts. The milling process cut the appropriate amount of teeth into the blanks. Rule's contract with GSA called for 18, 24, and 32 pitch hacksaw blades.

3. *Setting, Flame Treating and Tempering.* Each blade was then set by bending waves into the milled teeth. The set blades were flame-treated by passing them through an open flame and then tempered by placing the blades in large ovens.

4. *Painting, Printing and Packaging.* Rule then painted and printed identifying marks on the blades, and finally packaged the blades for delivery to GSA. Rule deliv-

ered over 4,700,000 hacksaw blades to GSA.

Although satisfied with the quality of Rule's hacksaw blades, the government brought this action under the False Claims Act, 31 U.S.C. § 3730[1] upon discovering that hacksaw blades were made from foreign-made hacksaw blanks. The government named as defendants Rule, William N. Anastos, Rule's president, and Gary M. Sable, Rule's general manager. According to the government, the hacksaw blanks were a "component" of the hacksaw blades, and because the foreign-made blanks accounted for approximately 90% of the cost of all the hacksaw blade's components, the blades were not a "domestic end product" as Rule had certified in the contract. Thus, the government alleged, defendants "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(1).

After defendants' motions for a directed verdict were denied, the court submitted special interrogatories to the jury in regard to the government's False Claims Act claim. One of the interrogatories asked the jury to answer the following question:

Has the plaintiff proved by a preponderance of the evidence that the hacksaw blade sold by Rule Industries to GSA was *not* a domestic end product?

If the jury answered "yes" to this question, it was then asked to determine whether the government had proved by clear and convincing evidence that defendants had "knowingly made false claims or a false statement to get a false claim paid" under Rule's four contracts with GSA, and to assess the appropriate statutory penalty.

■ By its responses in the verdict, the jury found that defendants had submitted false claims to the government. In essence, the jury determined that the hacksaw blanks were components of the hack-

---

**1.** The government's complaint also alleged that defendants had committed common law fraud, violated the four contracts, and obtained unjust enrichment. At the close of the government's case, the government waived its breach of con-

tract claim, and the district court granted defendants' motion for a directed verdict on the fraud and unjust enrichment claims. The government does not appeal from this ruling.

saw blades for purposes of the Buy American Act, and that Rule's certification that the hacksaw blades were domestic end products was false since the blank accounted for well over 50 percent of the cost of all the hacksaw blade's components. The jury also determined that defendants had *knowingly* [2] made this false claim on each of 302 invoices submitted to GSA for payment, and consequently assessed a penalty of $604,000, a $2,000 penalty for each false claim as provided by the False Claims Act, 31 U.S.C. § 3729. The district court denied defendants' motions for a judgment notwithstanding the verdict. Defendants now appeal.

We discuss below, in turn, each of defendants' claims of error.

## II. AN ISSUE FOR THE JURY OR FOR THE COURT?

■ Defendants contend that the district court erred in refusing to direct a verdict on the issue of whether the hacksaw blades sold to GSA were domestic end products. According to defendants, the district court, not the jury, should have applied the law (the Buy American Act and the Federal Acquisition Regulations) to the undisputed facts (the manufacturing process of the hacksaw blades supplied by Rule, industry practice regarding this process, the source and cost of the various parts of the hacksaw blade). Had the court done so, it had to rule, in defendants' view, that the hacksaw blades were domestic end products.

We disagree. We hold that, in a case of this nature, it was for the jury to apply the fluid legal standards of the Buy American Act and the regulations to the myriad detailed facts, undisputed though they were.

To understand why this was a jury question, we must visit the shadowy precincts of the Buy American Act. Upon so doing,

we find that the Act, and the federal agencies involved in its administration, have left matters in such a state that determining whether the hacksaw blades Rule supplied to GSA were domestic end products called for an individualized, fact-specific inquiry rather than the application of a definite rule to known facts. This situation originates in the rather arbitrary standards and uncertain wording of the Act itself, a depression era law enacted in 1933 to create jobs for American workers and protect American industry. *See* Gantt & Speck, *Domestic v. Foreign Trade Problems in Federal Government Contracting: Buy American Act and Executive Order*, 7 J.Pub.L. 378 (1958). The Act permits "only such manufactured articles, materials, and supplies as have been *manufactured* in the United States substantially all from articles, materials or supplies mined, produced, *or manufactured*, as the case may be, in the United States, shall be acquired for public use...." 41 U.S.C. § 10a (emphasis added). This language opens the door to the use of foreign materials as long as they have been subjected to a certain amount of domestic manufacture. As stated in one text,

> [T]he Act applies only to the last two stages: As the last stage, the end products acquired for public use must have been mined, produced or manufactured ... in the United States. And as the next to the last stage, manufactured end products must have been manufactured from materials or components mined, produced, or manufactured in the United States.... If the supplier can introduce two stages of manufacture in the United States into the distribution process, he insulates earlier foreign mining, production, or manufacture from the application of the Act.

2. Defendants do not question on appeal that there was ample evidentiary support for a finding that each claim, if false, was *knowingly* made. Evidence at trial indicated that, during the course of the contracts, defendants themselves thought the blanks were "components" of the hacksaw blades and that the blades were not domestic end products. For example, after GSA had raised its concern over Rule's compliance with the Buy American Act, Gary Sable falsely told a GSA official that Rule would be using domestic steel to make the hacksaw blades. In addition, it could reasonably be inferred that Rule destroyed the packaging of the foreign hacksaw blanks, some of which contained the wording "Made in Sweden," in order to prevent GSA inspectors from discovering the source of the blanks.

Gantt & Speck, *supra*, at 384. *See also* 48 C.F.R. § 25.101 ("In determining if an end product is domestic, only the end product and its components shall be considered."); Chierichella, *The Buy American Act and the Use of Foreign Sources in Federal Procurements—An Issues Analysis*, 9 Pub.Cont.L.J. 73 (1977). As the Comptroller General has held:

> In the case of manufactured products, the act is applied to the end product itself and to the components directly incorporated in the end product but is not applied to the supplies that are used in the manufacture of any such components.

45 Comp.Gen. 658 (1966). *See, e.g., Hamilton Watch Co.*, Comp.Gen.Dec. B–179939, 74–1 Comp.Gen.Proc.Dec. ¶ 306 (1974) (watch was domestic end product even though American-made watch movement, the main component, was assembled entirely from foreign-made parts).

Consequently, Rule's hacksaw blades were a domestic end product if they went through *two* states of domestic "manufacturing": 1) the hacksaw blade, the end product,[3] itself must have been "manufactured in the United States"; and 2) the cost of the hacksaw blades' components "manufactured in the United States" must have accounted for more than 50 percent of the total cost of the components. As it appears that Rule applied at least one domestic "manufacturing" process to the hacksaw blanks in milling, setting, flame-treating, tempering, and painting them, the real Buy American Act issue in this case turns on whether this manufacturing process comprised not only end product manufacture, but also "component" manufacture. This issue involves an inquiry into "the severability of the process claimed to constitute manufacture of the component from the overall process that eventuates in the end product." Chierichella, *supra*, at 87. Unfortunately, the Act does not define "manufacture" or "component." And while the regulations define components as "those articles, materials, and supplies

which are incorporated directly into the end products," 48 C.F.R. § 25.101, they provide no definite formula as to what processes constitute "manufacture" or can be divided into *two* separate stages of manufacture: component manufacture and end product manufacture.

The Comptroller General, with but limited success, has tried to provide general guidance regarding these terms and issues. Comptroller General decisions have tended towards giving a broad meaning to "manufacture."[4] *See In re Imperial Eastman Corp.*, 53 Comp.Gen. 726 (1974) (assembly of tool kit from individual component tools constituted manufacture); 46 Comp.Gen. 812 (1967). In addition, in determining whether a production process constitutes *component* manufacture of some foreign material, as opposed to merely one step in the overall *end product* manufacturing process beginning with the foreign material (thus making the foreign material the "component"), the Comptroller General has stated in general that "if a manufacturing process performed on material results in a separately identifiable component that in turn is integrated into the end product being procured, the material does not constitute a component." *In re Orlite Engineering Co.*, 88–1 Comp.Gen.Proc.Dec. ¶ 300 (1988). *See* J. Cibinic & R. Nash, *Formation of Government Contracts* 633 (1982) ("The basic test seems to be that if the operations performed on the foreign item create a basically new material or result in a fundamental change in the item, prior to incorporation into the end product, it becomes a component manufactured in the United States."); D. Riley, *Federal Contracts Grants & Assistance* § 11.07, at 556 (1983) ("The principal domestic content test is whether the domestic operations performed on a foreign item create a new item or result in some fundamental change in the item, prior to incorporation into the end product so that it then becomes a component manufactured in the United States.").

---

**3.** There is no dispute that the hacksaw blade was the "end product."

**4.** However, the Comptroller General has ruled that "manufacture" does not include packaging, testing, and/or evaluation operations. 48 Comp.Gen. 727 (1969).

In applying this general criterion to particular cases, the Comptroller General, according to one comment, "has drawn some fine distinctions in this area resulting in considerable confusion." Cibinic & Nash, *supra*. For instance, compare 48 Comp. Gen. 727 (1969) with *In re Davis Walker*, 76–2 Comp.Gen.Proc.Dec. ¶ 182 (1976). In the former, a domestic manufacturer imported Japanese forging and then subjected the foreign forging to three production processes (hone boring, chrome plating, machining) to produce the end product, cylinder liners. The Comptroller General found that the cylinder liners were not domestic end products because they were made substantially from *foreign* components (the Japanese steel cylinder liner forging):

> Although it appears that the boring, plating, and machining operations may properly be classified as manufacturing operations, and we believe that such manufacturing operations, taken as a whole, which were necessary to make the unfinished cylinder liner forging into the finished liner required by the Government, may reasonably be regarded as adequate to establish that end product as an article manufactured in the United States, it is clear that the *articles, materials,* or *supplies* which were incorporated into the end product during the overall manufacturing operation were substantially all *foreign* articles, materials, or supplies rather than domestic articles, materials or supplies as required by the act. Further, we do not believe that each of the several boring, plating, or machining operations performed on the liner during the overall manufacturing process may be properly regarded as producing a ba-

sically new manufactured article or material at the end of any particular operation, which could be considered as a component manufactured in the United States.

48 Comp.Gen. at 730.[5]

The Comptroller General's analysis in the above 1969 cylinder liner case is hard to square with *In re Davis Walker*, 76–2 Comp.Gen.Proc.Dec. ¶ 182 (1976). In *Davis Walker*, the supplier imported steel rods from Japan and subjected the steel rods to two domestic production processes (drawing the rods into "bright wire," and galvanizing the bright wire) to produce the end product, galvanized steel wire. The Comptroller General found that the galvanized steel wire was a domestic end product. In doing so, the Comptroller General upheld the contracting officer's characterization of the bright wire as the component (the foreign steel rod was merely a "subcomponent"), and rejected the argument that "there is only one continuous [end product] manufacturing process involved in converting the Japanese steel rod into galvanized steel wire and that the component[ ] of the end product [was the] steel rod[ ]...." 76–2 Comp.Gen.Proc.Dec. ¶ 182.[6] While upholding the contracting officer's decision, the Comptroller General stated:

> [W]e believe this case illustrates the need for guidance in defining the term "manufacture" as used in the Buy American Act so that procuring agencies will be able to insure that only domestic source end products are acquired for public use. Therefore, by letter of today to the director of the Defense Supply Agency, we are recommending that consideration be given to amending [the Armed Services Procurement Regulations] to define and

---

**5.** *See also In re Cincinnati Electronics Corp.,* 55 Comp.Gen. 1479 (1976) (substantial assembly of parts into nearly fully assembled radio did not make the latter a "component"; original parts retained their identity as components); Comp. Gen. B–166613, 13 CCF ¶ 306 (1969) (domestic manufacturing process—cutting, bending, welding, finning—did not convert foreign tube into domestic component).

**6.** *See also In re Orlite Engineering Co.,* 88–1 Comp.Gen.Proc.Dec. ¶ 300 (1988) (cutting, molding, heating, bonding, trimming, drilling,

painting, and edging applied to special steel fabric to produce helmet shell made helmet shell, not fabric, the "component"); *In re Yohar Supply Co.,* 87–1 Comp.Gen.Proc.Dec. ¶ 152 (1987) (stamping, bending and smoothing of pre-measured steel into lock parts made lock parts, not steel, "components"); 45 Comp.Gen. 658 (1966) (in producing the end product—reinforcing bars—supplier imported foreign ingots, manufactured ingots into "billets," and turned billets into the reinforcing bars; billets, not ingots, found to be "components" of end product).

clarify the requirement that items acquired for public use be "manufactured in the United States."

*Id.* *See also In re Cincinnati Electronics Corp.,* 55 Comp.Gen. 1479, 1497 (1976). The Comptroller General's letter was to no avail, however: the Department of Defense declined to amend the regulations. *See In re Scott Industries,* 79–1 Comp.Gen.Proc. Dec. ¶ 316 (1979).

The upshot of our inquiry is that whether component manufacture has taken place depends very much on an independent evaluation of the production processes and the facts in each particular case. Thus, in the instant case, as already noted, whether the hacksaw blades were domestic end products turns on whether the domestic production processes (the milling, setting, flame-treating, tempering and painting) which took place in Rule's Gloucester plant comprised not only end product manufacture but also *component* manufacture. Defendants assert that the milling constituted component manufacture, and thus the domestically *milled* blank, not the foreign-made blank, was the component "incorporated directly" into the hacksaw blade. The government, on the other hand, maintains that the foreign blank was the component; the domestic production processes, including the milling, were all a part of the continuous, inseparable, *end product* manufacturing process. The district court sent this disagreement to the jury, "find[ing] that the characterization of the manufacturing process requires a factual analysis which is genuinely disputed and must be left to the jury." We agree with the district court that this issue was for the jury to decide.

To be sure, the underlying facts were apparently not in dispute. There was no disagreement as to the steps in the production process, nor was there a dispute regarding the source or cost of the items, including the blanks, that made up the hacksaw blades. As a general rule, it is also quite true that the "application of a statute's terms to undisputed facts ... is a question of law." *Stissi v. Interstate and Ocean Transport Co.,* 765 F.2d 370, 374 (2d Cir.1985) (citations omitted). *See also*

*United States v. Articles of Drug: 5906 Boxes,* 745 F.2d 105, 113–14 (1st Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1358, 84 L.Ed.2d 379 (1985).

A jury, however, is sometimes called on to determine more than the underlying, or "historical," facts. It may also be called on to decide "questions of application," although, as commentators have pointed out, it is not so easy to articulate a "theoretical difference between questions of application that are left to the jury and questions of application that go to the judge[;] ... the division of jurisdiction is largely a matter of precedent." Zuckerman, *Law, Fact or Justice?,* 66 B.U.L.Rev. 487, 495 n. 26 (1986). *See also* Mureinik, *The Application of Rules: Law or Fact?,* 98 Law Q.Rev. 587 (1982).

In a variety of cases decided by this court, we have held that, even where the historical facts were not in dispute, the *"evaluative* application[ ] of legal standards ... to the facts" was a jury question. *Swift v. United States,* 866 F.2d 507, 511 (1st Cir.1989). The jury has been called on to make such "evaluative" applications of law to fact regarding the issue of proximate cause, *Swift,* 866 F.2d at 511; *Springer v. Seaman,* 821 F.2d 871, 876 (1st Cir.1987); W. Prosser & W. Keeton, *Prosser & Keeton on Torts* 320 (5th ed. 1984), as well as the existence of a master-servant relationship. *See Kassel v. Gannett Co.,* 875 F.2d 935, 941–942 (1st Cir.1989) (determination of whether reporter was a servant or independent contractor was "precisely the sort of 'mixed' fact-law question which falls peculiarly within the competence of the jury *qua* factfinder"); *Wilson v. Nooter Corp.,* 475 F.2d 497, 501 (1st Cir.) (question of which employer exercised right to control "borrowed" servant susceptible to resolution by jury), *cert. denied,* 414 U.S. 865, 94 S.Ct. 116, 38 L.Ed.2d 85 (1973).

The above cases involved the application of fact-sensitive, rather amorphous legal standards to an extensive set of nuanced facts. All required a choice among various reasonable inferences and the exercise of everyday, common sense judgment. Given

the nature of the task, with its focus upon unravelling a mixed question of law and fact, we held that the jury was the most suitable forum.[7] *See Wilson,* 475 F.2d at 501 (directed verdict inappropriate, "even on undisputed evidence, if the evidence gives rise to conflicting inferences").

Similarly, like the court below, we believe the present case called for the jury to make an "evaluative" application of the law to the facts in determining whether Rule's domestic production processes amounted to component manufacture, or, in other words, whether the blank or the milled blank was the component "incorporated directly" into the hacksaw blades. The Buy American Act and the regulations, as explained above, draw ill-defined lines between stages of production. Instead of providing a straightforward, widely applicable formula to determine domesticity, the Act and the regulations call for a case-specific inquiry into the significance and severability of Rule's domestic production processes. This multifarious inquiry involves weighing and comparing the various steps of the production process and considering the contract specifications as well as industry practice concerning the manufacture of hacksaw blades and the use of blanks in making different types of tools. We think that conflicting, reasonable inferences could be drawn from this inquiry regarding the characterization of the production process of the hacksaw blades. This "evaluative" mixed question of law and fact was for the jury to decide "based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." *Commissioner v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960) (whether transfer was a "gift" excludable from income under the Internal Revenue Code is an issue of fact to be determined on a case-by-case basis; thus, clearly erroneous standard applied). Consequently, we hold that the district court did not err in submitting to the jury the question of whether the hacksaw blades produced by Rule were domestic end products.

We emphasize that we do not mean to weaken much less reject the well established principle that application of standards set by statutes, regulations and precedent to undisputed facts will normally give rise to a "question of law" for the court. That principle ensures that the law is applied in a uniform and predictable fashion. It is the rare case of statutory interpretation that will constitute an exception. The statutory and regulatory standards in this case, however, do not lend themselves to accomplishing these goals as the Comptroller General decisions discussed above indicate. Instead, the Buy American Act issues raised in this case required a fact-intensive, case-by-case task of choosing between reasonable, conflicting inferences based on common sense judgment. We thus hold that in the exceptional circumstances of this case—involving complex facts, weak and individualized rules, and other factors above mentioned—the

---

**7.** In this circuit, mixed questions of law and fact, when made by the district court sitting as the factfinder, are normally governed by the clearly erroneous standard of review of Fed.R. Civ.P. 52(a). *See, e.g., United States v. Wright,* 873 F.2d 437, 444 (1st Cir.1989) (district court's decision whether defendant is a "minor" or "minimal" participant in offense under Sentencing Guidelines subject to clearly erroneous review partly because inquiry is "essentially factual" and "resolution of question raises no important, widely applicable issues of law"); *Curley v. Mobil Oil Corp.,* 860 F.2d 1129, 1132 (1st Cir. 1988) (ruling that letter made "time of the essence" in performance of contract reviewed under clearly erroneous standard). *See also Mucha v. King,* 792 F.2d 602 (7th Cir.1986) (applying clearly erroneous review to district court finding of legal possession even though historical facts not in dispute). *See generally Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982). While not directly supportive of our holding in this case in that determining the appropriate standard of appellate review involves "draw[ing] the line between the trial judge's responsibility and [the appellate court's] responsibility," *Mucha,* 792 F.2d at 605, these cases do suggest that the primary responsibility for drawing conclusions in the twilight zone between "fact" and "law" is at times best placed with the "factfinder," whether the factfinder be the trial judge or the jury. *See generally* S. Childress & M. Davis, 1 *Standards of Review* §§ 2.18, 3.9 (1986).

jury should be the appropriate evaluative body.

## III.  JURY INSTRUCTIONS

■ Defendants argue in the alternative that the district court erred in not giving four of defendants' requested jury instructions:

1.  If you find that the steel blanks were raw material, and if you find that the blanks underwent at least two manufacturing processes in Rule Industries' plant in Gloucester, Massachusetts, then you must find that the finished high speed steel hacksaw blades supplied to the GSA by Rule Industries complied with the Buy American Act.

2.  If you find that the steel blanks used by Rule Industries were subject to two or more manufacturing processes in Rule Industries' plant in Gloucester, Massachusetts, then you must find that the high speed hacksaw blades supplied by Rule Industries to the GSA were domestic source end products in compliance with the Buy American Act.

3.  If you find that the size or shape of the steel blank was altered or changed by Rule Industries, then you may find that the process of effectuating that alteration or change constituted "manufacture" under the Buy American Act.

4.  If you find that the physical properties or characteristics of the steel were altered or changed by Rule Industries, then you may find that the process of effecting that alteration or change constituted "manufacture" under the Buy American Act.

In reviewing the district court's jury instructions this court has stated:

The function of the appellate court with respect to jury instructions is to satisfy itself that the instructions show no tendency to confuse or mislead the jury with respect to the applicable principles of law.  The fairness of the charge cannot be determined by considering only a portion out of context, the entire charge

must be examined.  The purpose of jury instructions is to advise the jury on the proper legal standards to be applied in determining issues of fact as to the case before them.  The trial court is not obligated to give instructions which are not erroneous or misleading, nor to use the precise words proposed by one party in its instructions;  it is sufficient if the principle of law is correctly stated.

*Harrington v. United States*, 504 F.2d 1306, 1317 (1st Cir.1974) (citations omitted).  *See also Joia v. Jo–Ja Service Corp.*, 817 F.2d 908, 912 (1st Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

We think the district court's jury instructions (the relevant portions of these instructions are set out in an appendix to this opinion) satisfied this standard.  Far from misleading or confusing the jury, the instructions were cast in understandable, straightforward terms, and, taken as a whole, properly conveyed the applicable law regarding the Buy American Act issue in this case.  Rather than reciting legal abstractions, the instructions took the language of the Act and the regulations and put them in the context of the concrete facts of this case, explaining each party's position concerning what should be considered the "component" of the hacksaw blades.

Defendants' requested jury instructions differed more in form than in substance from the instructions the district court gave.  *See* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2556, at 655 (1971) ("The particular form of instructions is generally within the trial court's discretion.").  The district court did not err in focusing the jury's inquiry on the "component" stage of manufacture and whether the blank or the milled blank was "directly incorporated" into the hacksaw blade, rather than adopting the more general, abstract inquiry into "two or more manufacturing processes" as suggested in defendants' first and second requested instructions.[8]

---

**8.**  The district court did refer to the different stages of production in terms of the facts of this case in explaining defendants' position that the

milled blank was the component: "Of course, there is an intermediate step, I guess there are

Nor did the district court err in not giving the definitions of "manufacture" proffered in defendants' third and fourth requested instructions. The district court gave two examples of "manufacture" in referring to Comptroller General decisions: "[T]he plating of a certain fixture was held to change the original fixture from being a component. In another case, the galvanizing of a piece of wire, which is simply plating it with zinc, was supposed to be the manufacturing process that changed it." The court was not required to go beyond this and attempt an elaborate definition of "manufacture"; "words familiar to persons of ordinary intelligence do not require definition." 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2556, at 658. *See Kend v. Chroma–Glo, Inc.*, 478 F.2d 198, 201–02 (8th Cir.1973) (no error in refusing to instruct jury as to legal meaning of "procuring cause").

Judge Wyzanski once stated, "the object of a charge to a jury is not to satisfy an appellate court that you have repeated the right rigmarole of words, but to try to make jurors who are laymen understand what you are talking about." *Cape Cod Food Products, Inc. v. National Cranberry Association*, 119 F.Supp. 900, 907 (D.Mass.1954). Because we think the district court did an exemplary job in trying to make the jurors understand the applicable law in this case, we affirm its refusal to give defendants' requested jury instructions.

*Affirmed.*

### APPENDIX

### Jury Instructions

I'm afraid I am about to play a rather dirty trick on you in this respect, because as to one aspect of the law it is so fact intensive, it is so fact oriented, that it will be you, in your analysis of the facts, who really give the law its meaning, and I will try to explain this in a minute when we get into this Buy American situation....

[I]t is absolutely basic to the United States' recovery in this case that the hacksaw blade sold by Rule Industries was not a domestic end product. Now, a domestic end product is the term of art which is in the statute under the Buy American Act and it means, if it is a domestic end product, that there was no violation, there was no misstatement in the certificate, and there was no obligation to up the bid by 50 percent in the awarding of the contract.

Now, we start to get into the specialized use of the word. It's a great mistake to believe that the same word always means the same thing. The same word will have different meanings in different contexts and, in the law particularly, a word may be given a very special meaning for a special circumstance.

If you want to prove this or demonstrate this in ordinary talk, you can take the word "dog" and use it and say, "That's a dog and not a cat," and you know exactly what a dog is, the dog barks, the dog wags his tail. But if you say, "You know that Edsel that I bought some years back was a real dog," you are not saying that the automobile has four legs and wags its tail and barks. You are using the word a different way.

That's a rather extreme situation, but here the word "component" has become a term of art or, as we might say in common speech, a buzz word which has a specific meaning. Or at least ... a meaning different from that which we ordinarily use in conversation. Because, in conversation, a component means anything which is a part of something else.

In this context, component means something which is directly incorporated into the finished product which is sold to the government.

Now, it seems to be quite clear that the Buy American Act does not prohibit the use of foreign steel. This steel could be Russian or French or Turk or Prussian or perhaps Italian, but it doesn't matter, it depends upon the form according to the government's position.

As I understand it, the government has said, "if this Swedish and Japanese steel

two intermediate steps, where the teeth are set and the steel is hardened and then tempered."

came in the form of sheets or coils and was chopped up, that would be a sufficient alteration, a sufficient manufacturing process, so that the component would then be something, so that the component would then be something different from the product that came from the foreign country." I think perhaps it would be useful for me to read to you just what the Buy American Act says.

I will leave out some of the part that doesn't bear on this case. "Only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States and only such manufactured articles, materials and supplies that has [sic] been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States shall be acquired for public use."

. . . .

So, [showing the jury the hacksaw blade] what is sold to the government is this blue item, all right? . . . There is your finished item. That is the item which is supposed . . . to have been manufactured substantially all from articles, materials, or supplies manufactured in the United States. . . .

Now, according to the regulations that have been generated under this Act, this statute means that a component, the cost of which is 50 percent or more of the total cost of the item, must also have been manufactured in the United States. This [the hacksaw blade] has to be manufactured in the United States (indicating) and a component, the cost of which is 50 percent or more of the total cost of the item has also to be manufactured in the United States.

The government says that the step before this toothless blank, that is to say, the coil or the sheet, is not a component, and that can be manufactured somewhere else. That's fine. But they say that this [the hacksaw blank] is a component because it is directly incorporated in the saw blade.

The defendants say no, it [the hacksaw blank] is not directly incorporated because this is not irrevocably a hacksaw blade, can be used for quite a number of other things, a stiffener, perhaps; but the government says, well, look at it, it is the same shape as a saw blade.

The defendants say, no, it's this item, the one with the teeth in it [the milled hacksaw blank], that's the component, there the item has become—commitment has been made, this is clearly directed toward becoming a hacksaw blade. This is the component that we're talking about, this is the buzz word, the term of art "component" means in this case, because this is clearly on its way to becoming directly incorporated into this item. Of course, there is an intermediate step, I guess there are two intermediate steps, where the teeth are set and the steel is hardened and then tempered.

And you would suppose that there might be some legal definition, but this is the dirty trick part that I mentioned earlier, there really isn't. And the administrative decisions that are of record are all over the lot. It appears to have been a factual decision made in each case and sometimes inconsistently, in my view, at least.

In one case, the plating of a certain fixture was held to change the original fixture from being a component. In another case, the galvanizing of a piece of wire, which is simply plating it with zinc, was supposed to be the manufacturing process that changed it. So I can't tell you. . . . You've got to make a decision about this toothless blank, and you've got to decide in terms of its role in the manufacture of the [hacksaw blade], whether this is more like[ ] the strip, the coil, and is essentially, for purposed of this statute, raw material or whether it is a component and basically the same as this thing with the teeth in it [the milled blank]; and you'll have [the hacksaw blade and blank] and you can see that they are the same size, but there is some evidence that basically this is just one step away from the coil, being snipped off.

Sometimes, you can interpret these statutes in terms of their purpose. The purpose of the Buy American Act was to protect American industry during the Depression times, but it's hard to relate that, because, as I say, if the Rule Industries'

people had bought coil, they could have bought it from anywhere and no protection would have been offered to American steelmakers. The only protection that is offered is to American steelmakers who chop their steel into pieces just this size [the blank], if the government's position is adopted. So you have, somewhere, the question of drawing a line, which, I have to say to you, occurs to me to be somewhat arbitrary; but, in any case, the burden is on the United States to persuade you that for the purpose of this statute, the toothless blank is the component that had to have been manufactured in the United States in order to comply.