**In re SOFTWARE TOOLWORKS, INC. SECURITIES LITIGATION.**

**This document relates to All Actions.**

**No. C–90–2906 FMS.**

United States District Court, N.D. California.

March 30, 1992.

Alan Schulman, William S. Lerach, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., Sherrie R. Savett, Berger & Montague, P.C., San Francisco, Cal., Catherine A. Sullivan, for plaintiff Richard B. Dannenberg.

Alan Schulman, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., Sherrie R. Savett, Berger & Montague, P.C., San Francisco, Cal., Max W. Berger, Bernstein Litowitz Berger & Grossmann, New York City, for plaintiffs Mindy Blitz, Eugene Costiglio, Kenneth H. Ross, Homer Fleisher, Steven G. Cooperman, Nathaniel Orme, Ervin H. Fishman, Frederick Wertheimer, Barbara Wertheimer, William J. Bing, Arlene Bing, Anthony D. Shapiro, William Dulude, H.N. Brown, Jr., David E. Lockrow, Karl E. and Lucille C. Bauman and Jack Schnitzer.

Michael L. Zigler, Morrison & Foerster, San Francisco, Cal., for defendants Software Toolworks Inc., Leslie Crane, Eliza-

beth M. Barker, Joseph Abrams, Norman Worthington, Walter Bilofsky, Michael E. Duffy, Roger M. Buoy and Michael L. Noel.

Perry A. Irvine, Irvine & Cooper, Palo Alto, Cal., for Judson Mitchell.

Bruce G. Vanyo, Wilson Sonsini Goodrich & Rosati, Palo Alto, Cal., for defendants PaineWebber, Inc. and Montgomery Securities.

Philip R. Rotner, Karen Kennard, McCutchen Doyle Brown & Enersen, Michael L. Zigler, Morrison & Foerster, San Francisco, Cal., for defendant Deloitte & Touche.

## ORDER REGARDING SUMMARY JUDGMENT CROSS–MOTIONS

FERN M. SMITH, District Judge.

In this securities class action, class plaintiffs ("Plaintiffs"), defendant underwriters Montgomery Securities and PaineWebber, Inc. ("Underwriters") and defendant auditor Deloitte & Touche ("Deloitte"), move the Court for summary judgment or partial summary judgment as follows:

(1) Plaintiffs move for partial summary judgment against the Underwriters as to liability on Plaintiffs' Section 11 and 12(2) claims;

(2) Underwriters move for summary judgment on all claims against them;

(3) Plaintiffs move for partial summary judgment against Deloitte as to Section 11 and 10(b), and Rule 10b–5, liability on three issues;

(4) Deloitte moves for summary judgment on all claims against it, or alternatively, for partial summary judgment as to any of the Section 11 and

10(b), and Rule 10b–5, claims against it.

On December 31, 1991 the Court issued a tentative Order on the various cross-motions and scheduled a hearing. A hearing was held on February 14, 1992. The Court now issues its final Order, discussing the cross-motions in corresponding pairs; that is, (1) Plaintiffs vs. Underwriters and (2) Plaintiffs vs. Deloitte.[1] Relevant factual and evidentiary information will be incorporated and discussed as pertinent to each motion.

### PLAINTIFFS VS. UNDERWRITERS

Plaintiffs seek partial summary judgment against the Underwriters as to liability on Plaintiffs' Section 11 and 12(2) claims. The Underwriters seek summary judgment on all claims against them—*i.e.*, Plaintiffs' Section 11, 12(2) and 10(b) claims against them.[2] Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[3] A dispute about a material fact is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In order for Plaintiffs to attain summary judgment they must establish that summary judgment is appropriate as to every element of their securities claims. If the Underwriters can raise a genuine factual dispute as to any element—falsity, materiality, etc.—then the Plaintiffs' motion must be denied. *Id.* By contrast, the Underwriters can obtain summary judgment by defeating any one of those elements. Since

---

**1.** Plaintiffs and Deloitte have also filed motions to strike certain evidence pertaining to the Plaintiffs vs. Deloitte motions. Said motions to strike will be addressed, if and when appropriate, with the corresponding substantive motions.

**2.** For convenience, claims under Section 10(b) and Rule 10b–5 are collectively referred to as "Section 10(b) claims."

**3.** The standards and procedures for summary judgment and partial summary judgment are the same. Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial* § 14:33 (1991).

defeating any one element will not only afford summary judgment to the Underwriters, but will also necessarily decide Plaintiffs' motion, the Court will first address the Underwriters' motion.

### I. Underwriters' Motion for Summary Judgment

The Underwriters seek summary judgment on Plaintiffs' Section 11, 12(2) and 10(b) claims against them. According to the Underwriters, the evidence in the record indisputably demonstrates that their investigation in relation with the Registration Statement and Prospectus ("Prospectus") for Toolworks' July 1990 public offering ("Offering") satisfied the due diligence standard, and therefore exempts them from Section 11 or 12(2) liability. The Underwriters further claim that they are entitled to summary judgment on the Section 10(b) claims because Plaintiffs cannot prove the necessary scienter to establish primary or secondary liability under Section 10(b). Plaintiffs respond that the Underwriters cannot justify summary judgment since the evidence on the record: (1) establishes that the Prospectus was materially false and misleading and that the Underwriters failed to make a reasonable investigation of the accuracy of the Prospectus,[4] and (2) raises triable issues of fact with respect to Plaintiffs' Section 10(b) claims.

For the reasons set forth below, and after a full hearing and an exhaustive review of the facts and evidence presented by the parties, the Underwriters' motion for summary judgment is GRANTED and Plaintiffs' motion for partial summary judgment is DENIED.

### A. Prospectus Claims

 Section 11 affixes liability to underwriters of stock by means of a prospectus which is materially misleading, unless they prove they exercised due diligence to discover and eliminate such false and misleading statements. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983); 15 U.S.C. § 77k. Similarly, an underwriter who offers or sells a security by means of a prospectus which contains a material misstatement or omits a material fact is liable under Section 12(2), unless he establishes an affirmative due diligence defense. 15 U.S.C. § 77*l*(2).[5] The standards under Sections 11 and 12(2) are therefore virtually the same. *See Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1228 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981).[6]

Without conceding any elements of Plaintiffs' prima facie case on the Prospectus claims, the Underwriters seek summary judgment solely on the issue of due diligence. They claim that the investigation they performed in connection with the Offering entitles them to the "due diligence" defense. *See, e.g., Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544 (E.D.N.Y.1971) (absolving underwriters on ground of due diligence). Plaintiffs contend that the Underwriters cannot establish a due diligence defense because there is substantial evidence that the Underwriters failed to perform a reasonable investigation into (1) Toolworks' Nintendo business, (2) the results of the June 1990 quarter, and (c) recognition of revenues on Toolworks' Original Equipment Manufacture ("OEM") software licensing business. Plaintiffs further claim that it is not proper to decide the adequacy of due diligence on summary judgment, because what constitutes a reasonable investigation is a mixed question of law and fact for the jury to decide.

### 1. Deciding the Adequacy of Due Diligence on Summary Judgment

What is a factual and what is a legal question for purposes of summary judg-

---

**4.** In other words, that Plaintiffs are entitled to partial summary judgment on the Section 11 and 12(2) claims.

**5.** Unlike Section 10(b) and Rule 10b–5, Section 11 and 12(2) liability does not require proof of scienter. *See* 15 U.S.C. §§ 77k(a) & 77*l*(2).

**6.** For convenience, claims under Section 11 and 12(2) will be collectively referred to as the "Prospectus claims."

ment is not easily determined. *See Pullman–Standard, Division of Pullman, Inc. v. Swint*, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982). At one extreme, the resolution of disputes over historical facts (a thing done, an action performed, or an event or occurrence) is a factual question for the jury. At the other extreme, when the facts material to the application of a pure rule of law are undisputed, the application is a matter of law for the court, requiring no trial. In between these extremes, there is a large continuum occupied by mixed questions of law and fact.

■ Mixed questions of law and fact generally require the resolution of disputes over historical facts, a matter for the jury. When the dispute is not over historical facts, however, but over their legal significance, the issue may be appropriate for summary judgment. *See Horton v. Taylor*, 767 F.2d 471, 478 (8th Cir.1985); Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 472–73 (1984). After a careful review of the record, the Court finds that there are no genuine issues of material historical fact with regard to the Underwriter's due diligence defense. The disagreement between Plaintiffs and the Underwriters revolves around whether the due diligence performed was enough to entitle the Underwriters to a statutory defense under Section 11 and 12(2).

■ The "application of standards set by statutes, regulations and precedent to undisputed facts will normally give rise to a 'question of law' for the court. That principle ensures that the law is applied in a uniform and predictable fashion." *U.S. v. Rule Industries, Inc.*, 878 F.2d 535, 542 (1st Cir.1989); *see also McDermott Int'l, Inc. v. Wilander*, —— U.S. ——, ——, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991); *Stissi v. Interstate and Ocean Transport Co.*, 765 F.2d 370, 374 (2d Cir.1985). The Court, however, must decide whether the context in which the question arises makes it more appropriate for decision by judge or by jury. *See, e.g., Rule Industries, Inc.*, 878

F.2d at 542 (Buy American Act presents rare instance where determination of statutory standard better suited for jury).

■ A decision likely to have significant precedential impact on the resolution of an issue imbued with the need for consistency and reasoned resolution is generally better suited for determination by the judge than the jury. The Supreme Court has stated, albeit in the context of allocation between trial and appellate courts, that "[r]egarding certain largely factual questions in some areas of the law, the stakes—in terms of impact on future cases and future conduct—are too great to entrust them finally to the judgment of the trier of fact." *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 501 n. 17, 104 S.Ct. 1949, 1960 n. 17, 80 L.Ed.2d 502 (1984). The question of the due diligence defense in securities cases is such an issue.

First, the due diligence defense is a statutory standard; as such, its application to undisputed historical facts should normally be a matter for the judge. *See Rule Industries, Inc.*, 878 F.2d at 542. This ensures that the administration of the statutory defense benefits from consistency, uniformity and predictability. *Id.* Second, a decision on the due diligence defense generally affects a class of persons (as opposed to one person), making it in the nature of judicial rule making. *See, e.g., Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278 (9th Cir.1989) (court decides as a matter of law that the renting of movies by a hotel to its patrons does not violate Copyright Act, an evaluative question that arguably is proper for a jury except that it potentially affects a large segment of the public); *see also* Keeton, *Legislative Facts and Similar Things: Deciding Disputed Premise Facts*, 73 Minn.L.Rev. 1, 20 (1988). Third, knowledge of what constitutes due diligence does not fall within the common experience of jurors, making it instead a question better suited for the judge. *See, e.g., R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 143 (9th Cir. 1989) (geographical boundaries of a market present a question of law since boundaries

dispute involve esoteric cost-benefit analysis, an inquiry beyond the straightforward finding of historical facts or common sense judgment for which juries are best suited). Fourth, leaving the question of what constitutes due diligence to the jury will lead to a battle of experts. While this may be appropriate in some cases, with a question like due diligence, the inquiry does not lend itself to any objective standards. The experts, who basically become paid advocates, will simply express an opinion based on their own subjective viewpoints, which will be biased by their role. The jurors will then be forced to decide between these paid advocates. The resulting uncertainty will increase litigation against deep pocket defendants (such as underwriters) and encourage collusion between plaintiffs and the issuer, who will often be in a precarious financial situation already. These policy implications favor summary judgment as the preferred means of resolution. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 641, 646, 107 S.Ct. 3034, 3039, 3042, 97 L.Ed.2d 523 (1987) (qualified immunity may be decided as a matter of law because of public policy concern to protect government agents from submitting to pretrial discovery); *Collins v. Nagle,* 892 F.2d 489, 494–95 (6th Cir.1989) (probable cause for arrest and reasonableness of force proper for summary judgment where case turns on policy determination and there is no material dispute over what transpired); *Dellums v. U.S. Nuclear Regulatory Comm'n,* 863 F.2d 968, 971 n. 5 (D.C.Cir. 1988) (causation decided on summary judgment when primarily a decision on policy). Finally, treating due diligence as a question of law, once the historical facts are undisputed, will apportion the risk more appropriately, encourage settlement at early stages and lead to more equitable and consistent results.

■ The Court therefore finds that the adequacy of due diligence may be decided on summary judgment when the underlying historical facts are undisputed. *See also Weinberger v. Jackson,* [1990–91 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,693 at 98,255–56, 1990 WL 260676 (N.D.Cal.1990)

[hereinafter *Weinberger*]; *Laven v. Flanagan,* 695 F.Supp. 800, 811–12 (D.N.J.1988).

2. *Applying the Due Diligence Standard*

■ Section 11 and 12(2) require a "reasonable" investigation by the Underwriters. *Weinberger* at 98,255; 15 U.S.C. §§ 77k(b)(3) & 77*l*(2). This does not, as Plaintiffs imply, require an audit on the part of the Underwriters. Underwriters cannot "be expected to possess the intimate knowledge of corporate affairs of inside directors, and their duty to investigate should be considered in light of their more limited access." *Feit,* 332 F.Supp. at 582. Accordingly, underwriters may reasonably rely on SEC letters and documents (*see Feit,* 332 F.Supp. at 583 (underwriter entitled to rely on issuer's counsel's letter to SEC)), as well as on representations of management. *See Weinberger* at 98,255–06 (underwriters may rely on management's representations after several meetings and other verification). That is not to say that underwriters may "tacit[ly] rel[y] on management assertions" (*Feit,* 332 F.Supp. at 582); rather, underwriters may rely on management's representations when it is reasonable to do so under the circumstances. It would be unreasonable, for example, to solely rely on management's representations when said representations could have been reasonably verified. *See Escott v. BarChris Construction Corp.,* 283 F.Supp. 643, 696–97 (S.D.N.Y.1968). It is not unreasonable, however, to rely on management's representations with regard to information that is solely in the possession of the issuer and cannot be reasonably verified by third parties. Underwriters cannot be expected to ferret out everything that management knows about the company; they only need to reasonably attempt to verify and believe the accuracy of the information in the prospectus. If the Underwriter's overall investigation was reasonable under the circumstances, they are entitled to a due diligence defense. *See Weinberger* at 98,255.

### a. Did Underwriters Perform a Reasonable Investigation of the Nintendo Business?

■ Plaintiffs contend that the Underwriters failed to perform sufficient due diligence on Toolworks' Nintendo business, particularly with regards to the company's policy on product returns and price protection. The Court disagrees. The Underwriters interviewed over a dozen Toolworks and Mindscape officials, exploring all aspects of Toolworks' business. They then verified management's representations by contacting three major Nintendo customers, the distributors of Toolworks' PC software, three major software developers or licensees, and customers of the Priority subsidiary. They also contacted Nintendo of America regarding the health of the Nintendo market, inspected the factory where Miracle Piano was being manufactured, subjected Toolworks' fiscal 1991 budget to line-by-line scrutiny and reviewed its financial statements with Deloitte.[7] The Underwriters even obtained written representations from Toolworks *and* selling stockholders that the Prospectus was accurate, as well as a comfort letter from Deloitte.

The Underwriters specifically confirmed with Toolworks' customers that they could not return non-defective Nintendo cartridges and surveyed Nintendo retailers (through Pillsbury, Madison & Sutro and John Weiss) to confirm no price-cutting on Toolworks' Nintendo products. They also properly followed up any "negative or questionable information [that] developed as a result of their investigation." *Wein-berger* at 98,255. When an article in the June 18, 1990 issue of *Barron's* questioned the health of the Nintendo market, for example, the Underwriters again contacted senior executives at Nintendo of America and were assured that the Nintendo market was holding as expected.[8] Also, when the Underwriters discovered a memo suggesting that Walmart could return working cartridges, they followed up and confirmed that the memo was an error and that Walmart could in fact only return defective cartridges.[9] The Underwriters did not solely rely on the word of management (*see Escott*, 283 F.Supp. at 697); they performed a thorough and reasonable investigation of Toolworks' Nintendo business, which is reflected in the extensive risk warnings contained in the Prospectus.[10]

### b. Did Underwriters Perform a Reasonable Investigation on the June Quarter Results?

■ Plaintiffs contend that the Underwriters failed to properly investigate Toolworks' June quarter results. The Court disagrees. The Underwriters repeatedly asked Toolworks about the quarter and were told that the only risk involved was whether cartridge orders due in June would arrive in time.[11] The Underwriters further received representation from Toolworks and Toolworks' outside auditors and counsel that, although preliminary results were not available, the results for the June quarter appeared to be satisfactory and consistent with expectations. Toolworks' counsel further represented to the SEC that the results for the quarter would be

---

7. Pillsbury, Madison & Sutro reviewed Toolworks' contracts, Board minutes, and similar documents.

8. Toys R Us also informed John Weiss, the Montgomery analyst who followed Toolworks, in early July that Nintendo cartridge and hardware sales were increasing.

9. Walmart, in fact, never returned any undamaged games.

10. The Prospectus sets out several risk factors such as warning of the Company's dependence on Nintendo, "the general seasonal nature of the consumer software industry," potential retail oversupply of cartridges, "no assurance that the Company will not be subject to product returns in the future," as well as "no assurance that the Company's recently introduced or planned products will achieve market acceptance." Prospectus at 6–8, 26. These warnings, along with many others in the Prospectus, may, by themselves, entitle the Underwriters to summary judgment. *See In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 515–16 (9th Cir.1991); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir. 1991).

11. Toolworks, Deloitte and Toolworks' counsel later stated that the cartridges had arrived on time and had been shipped to customers.

satisfactory. The Underwriters reasonably relied on such representations, particularly on the representations by the issuer and its counsel to the SEC. *See Feit,* 332 F.Supp. at 583.

### c. Description of the OEM Business

■ The description of Toolworks' OEM business in the Prospectus was "expertised" by Deloitte. Underwriters may reasonably rely on expertised financial statements. 15 U.S.C. § 77k(b)(3)(C); *see In re Gap Stores Securities Litigation,* 79 F.R.D. 283, 297–98 (N.D.Cal.1978); *Escott,* 283 F.Supp. at 687–97. Given the complexity of the accounting issues, the Underwriters were entitled to rely on Deloitte's expertise. The Underwriters, however, did not solely rely on Deloitte. They reviewed confirmations from each OEM, demanded a reconfirmation from Hyosung, and confirmed Toolworks' OEM revenue recognition policy with other accounting firms.[12] Their investigation of the OEM business was reasonable.

As a result of the overall investigation and due diligence, the Underwriters reasonably believed the accuracy of the information contained in the Prospectus. They had no knowledge of any misrepresentation or omission, nor had they reason to disbelieve any of the representations made to them. The Prospectus in fact reflects that where serious risks were unveiled or suspected, warnings were issued.[13] This Court therefore finds that the Underwriters conducted a reasonable investigation under the circumstances and are accordingly entitled to a due diligence defense.[14]

Summary judgment is therefore GRANTED in favor of the Underwriters with respect to Plaintiffs' Section 11 and 12(2) claims.[15]

### B. Section 10(b) Claims

#### 1. *Primary Liability*

■ Section 10(b) liability requires a showing of scienter—a mental state embracing intent to deceive, manipulate, or defraud. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). Scienter may be satisfied either by proof of actual knowledge or by proof of recklessness. *Id.* at 1568–69. The reckless conduct necessary to satisfy the scienter requirement is conduct "involving not merely simple, or inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1569 (citations omitted).

The Underwriters contend that there is no evidence that they knew of any material misstatements in the Prospectus and assert that they cannot be held reckless since they performed a reasonable due diligence investigation. They also contend that scienter cannot be proved as to their projections issued immediately after the Offering. Plaintiffs respond that there is compelling evidence that the Underwriters had actual knowledge of material facts which were omitted or misrepresented in the Prospectus and in letters to the SEC, or recklessly closed their eyes to obvious facts which should have alerted them to the truth. Plaintiffs also respond that there is evidence that the Underwriters recklessly issued projections of Toolworks' June quarter results on the roadshow and in reports issued following the Offering.

■ Scienter may properly be decided on summary judgment. *See Weinberger* at

---

**12.** The Underwriters also properly relied on the statements to the SEC by Toolworks' counsel concerning the basis for the OEM revenue recognition. *See Feit,* 332 F.Supp. at 583.

**13.** *See supra* note 11.

**14.** Plaintiffs' contention that had the Underwriters done more, they would have revealed problems, is not persuasive. The Court cannot evaluate an underwriter's due diligence defense

with the benefit of hindsight. The overall investigation performed here was reasonable under the circumstances at the time of the investigation.

**15.** Plaintiffs' motion for partial summary judgment against the Underwriters as to liability on Plaintiffs' Section 11 and 12(2) claims is necessarily DENIED.

98,255–56; *see also In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1117–18 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). The Underwriters may obtain summary judgment by simply showing that there is a failure of proof concerning scienter—an essential element of Plaintiffs' claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Plaintiffs, on the other hand, must produce "specific facts" sufficient to establish the existence of scienter (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)); speculative inferences drawn from circumstantial evidence will not necessarily do. *See, e.g., Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1422–23 (9th Cir.1990). Where, as here, there is absence of any motive, there exists a pattern inconsistent with scienter, or there is economic implausibility, plaintiffs bear a heavy burden in defeating summary judgment with inferences from circumstantial evidence. *See Apple Computer*, 886 F.2d at 1118 (no inference where defendants' overall pattern of conduct was inconsistent with scienter); *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470–71 (9th Cir.1987) (no inference where fraud implausible), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir.1989)

(same); *Ochs v. Shearson Lehman Hutton, Inc.*, 768 F.Supp. 418, 427–28 (S.D.N.Y.1991) (strong showing required absent a motive).[16] In other words, Plaintiffs are not entitled to the benefit of the doubt with respect to inferences from circumstantial evidence—only reasonable and non-speculative inferences under the circumstances of the case need be accepted. *See In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 441 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991).[17]

■ As the Court previously found, the Underwriters carried out a reasonable investigation on all aspects of Toolworks, including those subjects alleged to be misrepresented or omitted. The Underwriters diligently investigated the condition of Toolworks' Nintendo business, OEM revenue recognition, and the June quarter results. Their actions with respect to these alleged misrepresentation or omissions cannot be considered reckless. *Weinberger* at 98,255–56. Nor have Plaintiffs, as the following analysis shows, provided "specific facts" sufficient to establish (or reasonably infer under the circumstances of this case) that the Underwriters knew of any material misstatements or omissions.

### a. Condition of Toolworks' Nintendo Business

■ Plaintiffs claim that the Underwriters knew that the Nintendo market had

---

**16.** Plaintiffs offer no motive for the Underwriters to participate in the alleged fraud, except to point to the fees that they earned from the Offering. This Court has previously stated that an allegation that professionals committed fraud in order to obtain professional fees is not a persuasive motive to establish scienter. June 18, 1991 Order at 8–10, 1991 WL 319033. In fact, the risk of monumental damages against underwriters if found liable for securities fraud more than balances the temptation of ill-gotten gains and makes such a motive implausible. An underwriter's "greatest asset is its reputation for careful work. Fees for [an offering] could not approach the losses [the underwriting firm] would suffer from a perception that it would muffle a client's fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Nor do the actions of the Underwriters support a pattern consistent with scienter. The extensive risk warnings in the Prospec-

tus, for example, negate any inference of scienter. *See Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1516 (N.D.Cal.1990). If the Underwriters had intended to mislead investors, they would not have included such warnings, which could have discouraged investors from purchasing Toolworks stock. The overall circumstances make Plaintiffs' claim against the Underwriters implausible; Plaintiff must accordingly "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

**17.** Plaintiffs are nonetheless entitled to have any direct evidence taken as true. *See In re Coordinated Pretrial Proceedings*, 906 F.2d at 440–41. They, however, only offer speculative inferences from circumstantial evidence against the Underwriters.

become hit driven, seasonal and competitive. This is true. The Underwriters, however, did not hide this fact; instead, they made sure to explicitly disclose these changes in the Prospectus. Plaintiffs also claim that Underwriters knew that no Nintendo titles were selling well, that there was a glut of retail inventory, and that Toolworks' largest customers were reducing or eliminating purchases. Plaintiffs' evidence in support of these assertions, however, is not sufficient to infer scienter in this case. Plaintiffs' expert's opinion of what the Underwriters likely did or did not know is far from what is required to infer scienter under the circumstances of this case. *See, e.g., Ochs v. Shearson Lehman Hutton, Inc.,* 768 F.Supp. at 427–28.[18]

### b. OEM Revenue Recognition

■ Plaintiffs offer no evidence that the Underwriters knew that Toolworks' financial statements improperly recognized OEM revenue. Instead, Plaintiffs contend that certain "red flags" were so suspicious that the Underwriters' awareness of them amounts to scienter. "Aroused suspicions," however, "do not constitute actual awareness of one's role in a fraudulent scheme." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1128 (5th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989). To establish that a party "intended to violate the securities laws, plaintiffs must prove more than that the [defendants] recklessly ignored danger signals." *Id.* The Court has already found that the Underwriter's due diligence into Toolworks' OEM business establishes that they were not reckless.

### c. False Statements Regarding June Quarter Results

Plaintiffs attempt to infer from circumstantial evidence that the Underwriters knew at the time of the Offering that Toolworks' June quarter results were poor. Plaintiffs contend that the Underwriters should have been suspicious of representations made by Toolworks' auditors and lawyers, because Toolworks reported poor results for April (the first month of the quarter), and that the Underwriters knew that preliminary financial data was available for the quarter.[19] "Should have," however, is not the standard; the Underwriters can be liable only if they had actual knowledge or if their alleged misconduct rose to a level of recklessness. *Weinberger* at 98,255. The Court has already determined that the Underwriters' diligent investigation of the June quarter results cannot constitute recklessness, and now finds that the evidence proffered to infer actual knowledge of poor preliminary financial data for the June quarter falls short of that required to defeat summary judgment in this case. *See, e.g., California Architectural Bldg. Products,* 818 F.2d at 1470 (evidentiary burden for inference is heavy where fraud implausible).[20]

■ Finally, Plaintiffs fail to produce sufficient evidence to establish scienter with respect to the analyst reports issued by John Weiss and Lee Igsur. A projection or forecast may be considered false or misleading only where: (1) the statement is not genuinely believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisputed facts tending seriously to undermine the accuracy of the statements. *Apple Computer,* 886 F.2d at 1113; *see also In re*

---

**18.** Additionally, the Underwriters' follow-up investigations repeatedly revealed that Toolworks' games were not in trouble.

**19.** Plaintiffs primarily rely on a July 2, 1990 internal Toolworks spreadsheet to support their assertion that the Underwriters knew that preliminary financial data was available for the June quarter. Plaintiffs, however, present no evidence that the Underwriters saw the document or were aware of it. They instead contend that actual knowledge be inferred from this evidence.

**20.** Plaintiffs also fail to proffer sufficient evidence to establish the necessary scienter for their allegation that the Underwriters were reckless in their roadshow projections. The Underwriters' projections were reasonably based on representations made to them by the issuer and its auditor and lawyers (*see Feit,* 332 F.Supp. at 583); their conduct cannot be considered reckless.

*Convergent Technologies Securities Litigation,* 948 F.2d 507, 517 (9th Cir.1991) (opinions and predictions in research reports that have sufficient factual and/or historical basis are not actionable). Financial projections made in good faith are per se not made with scienter. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976) (no liability unless defendant "acted other than in good faith"). John Weiss and Lee Igsur have attested to their good faith belief in the accuracy of their earning estimates. There is no evidence that they knew of any facts not disclosed in their reports that would "seriously undermine" the accuracy of their reports. Plaintiffs offer of circumstantial evidence to infer scienter under these circumstances will simply not do.[21]

### 2. *Secondary Liability*

#### a. Conspiracy Allegations

This Court has held that for Plaintiffs to prevail on their conspiracy claim, they must provide "specific facts showing 'an agreement to participate in an unlawful act.'" June 18, 1991 Order at 9, 1991 WL 319033 (quoting *Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1520 (N.D.Cal. 1990)). The Ninth Circuit's recent definition of the showing of recklessness necessary to establish primary liability under Rule 10b–5 (*Hollinger,* 914 F.2d at 1569–70) does not, as Plaintiffs incorrectly suggest, alter this requirement. *See In re ASK Sec. Litig.,* No. C–85–20207(A)–WAI, slip op. at 10, 1991 WL 138334 (N.D.Cal. Mar. 11, 1991) (rejecting proposition that recklessness may satisfy the scienter requirement for secondary liability). Nothing in *Hollinger* overrules settled precedents holding that conspiracy requires proof of an agreement.[22]

Plaintiffs offer no evidence of an agreement by the Underwriters to enter into a conspiracy with Toolworks. Plaintiffs instead offer speculative inferences that a conspiracy existed. This will not do in this case. *See, e.g., Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987) (speculative inferences of conspiracy will not help).

#### b. Aiding and Abetting Allegations

Aiding and abetting liability requires proof of actual knowledge of the primary wrong and substantial assistance in committing it. *Jett v. Sunderman,* 840 F.2d 1487, 1495 (9th Cir.1988). Plaintiffs offer no evidence that the Underwriters knew that any of the statements made by Toolworks were false, nor that the Underwriters substantially assisted in the fraud by soliciting the Kleiber and Turzo reports. Plaintiffs fail to establish their burden under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgement is therefore GRANTED in favor of the Underwriters with respect to Plaintiffs' Section 10(b) claims.

### PLAINTIFFS VS. DELOITTE

Plaintiffs seek partial summary judgment against Deloitte as to Section 11 and 10(b) liability on three issues. Deloitte seeks summary judgment on all claims against it or, alternatively, partial summary judgment as to any of the Section 11 and 10(b) claims against it. As previously noted, Plaintiffs must establish that summary judgment is appropriate as to every element of their securities claims in order to attain summary judgement. If Deloitte can raise a genuine factual dispute as to any element, Plaintiffs' motion must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91

**21.** Plaintiffs claim, without any persuasive evidence, that Weiss and Igsur are not entitled to an independent analysts report standard because they were not in fact independent. Even if the Court accepted Plaintiffs' argument, the Court's conclusion would not change. Weiss and Igsur reasonably relied on representations made by the issuer and its auditor and lawyers in issuing their reports (*see Feit,* 332 F.Supp. at 583); their conduct cannot be considered reckless.

**22.** Nor does anything in *Hollinger* purport to overrule settled precedents holding that aiding and abetting requires actual knowledge. *See, e.g., Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1520 (N.D.Cal.1990) (aiding and abetting requires actual knowledge).

L.Ed.2d 202 (1986). Deloitte, by contrast, can obtain summary judgment by defeating any one element of Plaintiffs' claims. Since defeating any one element will not only afford summary judgment to Deloitte, but will also necessarily decide Plaintiffs' motion, the Court will first address Deloitte's motion.

## I. *Deloitte's Motion for Summary Judgment*

Deloitte seeks summary judgment on Plaintiffs' Section 11 and 10(b) claims against it. According to Deloitte, it is entitled to summary judgment on the Section 10(b) claims because Plaintiffs cannot prove the necessary scienter to establish primary or secondary liability under Section 10(b). Deloitte further claims that the evidence in the record indisputably demonstrates that their investigation in relation with the audited March 31, 1990 financial statements ("March 31, 1990 Financial Statements") included in the Prospectus satisfied the due diligence standard, and therefore exempts it from Section 11 liability. Plaintiffs respond that Deloitte cannot justify summary judgment since the evidence on the record: (1) raises triable issues of fact with respect to Plaintiffs' Section 10(b) claims, and (2) establishes that the Prospectus was materially false and misleading and that Deloitte failed to make a reasonable investigation of the accuracy of the financial statements included in the Prospectus.[23]

For the reasons set forth below, and after a full hearing and an exhaustive review of the facts and evidence presented by the parties, Deloitte's motion for summary judgment is hereby GRANTED IN PART AND DENIED IN PART.

### A. Section 10(b) Claims

#### 1. *Primary Liability*

■ Liability under Section 10(b) requires (1) a material misstatement or omission, (2) in connection with the purchase or sale of a security, (3) scienter, and (4) reliance. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). As previously noted, scienter may be satisfied either by proof of actual knowledge or by proof of recklessness. *Hollinger*, 914 F.2d at 1568–69.

Deloitte contends that Plaintiffs offer no evidence of scienter (nor in some instances of materiality) with respect to Plaintiffs' allegations that Deloitte is primarily liable under Section 10(b) for: (a) alleged misrepresentations in the March 31, 1990 Financial Statements and (b) alleged misrepresentations by a Deloitte partner to a securities analyst from Piper Jaffray & Hopwood.[24] Plaintiffs respond, not surprisingly, by asserting that there is ample evidence to establish scienter. The Court must therefore decide whether Plaintiffs produce "specific facts" sufficient to establish the existence of scienter (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)), without considering speculative or inconclusive inferences drawn from circumstantial evidence. *See Apple Computer*, 886 F.2d at 1118 (no inference where defendants' overall pattern of conduct was inconsistent with scienter); *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470–71 (9th Cir.1987) (no inference where fraud implausible), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Ochs v. Shearson Lehman Hutton, Inc.*, 768 F.Supp. 418, 427–28 (S.D.N.Y.1991) (strong showing required absent a motive).[25]

---

**23.** In other words, that Plaintiffs are entitled to partial summary judgment on the Section 11 claims.

**24.** Deloitte's materiality arguments will be addressed where appropriate.

**25.** As with the Underwriters, Plaintiffs offer no persuasive motive for Deloitte to participate in the alleged fraud, Deloitte's actions do not support a pattern consistent with scienter, and the

overall circumstances make Plaintiffs' claim against Deloitte implausible. *See supra* note 16. Plaintiffs must accordingly "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but cf. In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 441 (9th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991) (*Matsushita* only applies

a. March 31, 1990 Financial Statements

### 1. Nintendo Business

Plaintiffs allege that the March 31, 1990 Financial Statements improperly included: (a) in revenue, sales of three Nintendo titles which Deloitte knew, or was reckless in not knowing, Toolworks would have to issue price protection allowances on; (b) in revenue, sales of these titles to three distributors who Deloitte knew, or was reckless in not knowing, would exercise their right to return the slow moving Nintendo titles; and (c) in inventory, slow-moving and obsolete Nintendo titles, which Deloitte knew, or was reckless in not knowing, would have to be written down.

#### a. Price Protection

Deloitte contends that it is entitled to summary judgment on this issue because Plaintiffs offer no evidence to establish that the price protection granted in late June (without Deloitte's knowledge) had any material effect on the March 31, 1990 Nintendo sales. According to Deloitte, the alleged misrepresentations are not material since over 70% of the company's fiscal 1990 sales of Nintendo games were sales of Paperboy, an unqualified hit as to which Toolworks has never granted any price protection. A determination of materiality is a fact-specific issue "which should ordinarily be left to the trier of fact." *Apple Computer*, 886 F.2d at 1113. But where, as here, the moving party puts forth a valid argument and no evidence is presented to rebut it, the non-moving party fails to establish its burden under *Celotex*, and summary judgment is therefore appropriate.

■ Furthermore, Plaintiffs fail to offer sufficient evidence to establish the existence of scienter. Deloitte contends that Toolworks repeatedly represented to it that Toolworks' policy was not to allow price protection, and that Deloitte did not learn about any price protection offered on the three relevant Nintendo titles until long after the Offering. Plaintiffs note that Deloitte reviewed a draft of the Prospectus in May 1990 which included language that the company might have to modify its return policy. According to Plaintiffs, this language should have indicated to Deloitte that the Nintendo business was in trouble and should have caused Deloitte to expand its audit procedures. "Should have" is not the standard; Deloitte can be liable only if it had actual knowledge or if the alleged misconduct rose to a level of recklessness. *Weinberger* at 98,255. Speculative inferences from circumstantial evidence as to what Deloitte may have known and what audit procedures it should have taken, are far from the showing required to support Plaintiffs' claim that Deloitte had actual knowledge of any price protection,[26] or that Deloitte's conduct was such an extreme departure from ordinary care that Deloitte "must have been aware" of the danger of misleading the public. *Hollinger*, 914 F.2d at 1569.[27]

#### b. Sales to Three Distributors

Deloitte claims that these sales did not take place in fiscal 1990 and are not reflected in any way in Toolworks' audited March 31, 1990 Financial Statements. Plaintiffs offer no evidence to rebut this claim and accordingly fail to meet their burden under *Celotex*.

#### c. Nintendo Inventory

Deloitte contends that there is no evidence that any of Toolworks' 1990 Nintendo inventory was ever sold below cost and that the amount of 1990 Nintendo invento-

---

to plausibility of inferences from circumstantial evidence).

**26.** *See supra* note 25.

**27.** Nor are Plaintiffs' arguments that Deloitte should have performed all the audit steps it contemplated in its initial planning memorandum persuasive. Deloitte made a reasoned determination to modify its audit plan, as accountants often do. An unwise determination may rise to professional malpractice, but cannot be considered reckless in or of itself. Recklessness requires such an extreme departure from ordinary care that Deloitte "must have been aware" of the danger of misleading the public. *Hollinger*, 914 F.2d at 1569. Here, Deloitte focused on the issue, made inquiries, and evaluated the information received. The revised audit was admittedly less thorough than the first proposed audit, but cannot be considered reckless. *See Weinberger* at 98,255.

# 1504

ry was so minuscule that there could not have been a material overstatement.[28] Plaintiffs offer no evidence to rebut either argument and accordingly fail to meet their burden under *Celotex.*

## 2. *Mindscape Software Reserve*

Plaintiffs claim that the March 31, 1990 Financial Statements improperly included obsolete Mindscape computer software in inventory which Deloitte knew, or was reckless in not knowing, should have been written down to the lower of cost or market; in other words, the inventory *reserve* should have been higher than stated. Deloitte contends that whether the inventory should have been written down was a matter of judgment on which Plaintiffs disagree, not a basis on which to infer scienter. The Court agrees. Deloitte made diligent inquiries regarding Mindscape's inventory reserve and reasonably relied on representations regarding said reserve. Deloitte took a conservative position with respect to Mindscape inventory; for example, it passed on booking any reductions to the reserve, contrary to Toolworks' suggestions, when it thought it would be inappropriate.[29] Plaintiffs offer no evidence to rebut this; instead, they second guess Deloitte's decision that a 44% reserve was appropriate—this is not enough to infer scienter in this case. *See Apple Computer*, 886 F.2d at 1118 (no inference where defendants' overall pattern of conduct was inconsistent with scienter).[30]

## 3. *Mindscape Development and Royalty Costs*

Plaintiffs claim that Deloitte improperly included in revenue Mindscape royalty advances and guarantees; as a result, revenues were overstated by material amounts. Deloitte contends that Plaintiffs offer no admissible evidence of a material overstatement or of scienter to support their claims. The Court agrees. Plaintiffs' expert's bare conclusory statements are insufficient to defeat summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir.1985).

## 4. *OEM Revenue Recognition*

■ Plaintiffs claim that some or all of the $11.1 million in OEM licensing revenue that Deloitte recognized in the March 31, 1990 Financial Statements was improperly recorded, and that Deloitte knew, or was reckless in not knowing, that such misstatements took place.[31] Deloitte concedes that there is a genuine issue of material fact as to whether OEM licensing revenue recognized in fiscal 1990 was properly stated, but contends that the undisputed facts preclude a finding that Deloitte acted with scienter. It notes, correctly, that errors in a client's financial statements do not, by themselves, give rise to an inference that the auditor committed fraud. *See The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1045 (S.D.N.Y.1986).

■ Deloitte has shown that it performed extensive procedures with respect

---

**28.** Toolworks' 1990 financial statements reported $4.8 million in company-wide inventory. Of that total, only about $300,000 (less than 1% of the total assets of $37.029 million) consisted of Nintendo cartridges. That small amount, Deloitte argues, would have been immaterial even if it should have been written down to zero.

**29.** Toolworks represented to Deloitte that it believed its Mindscape reserves were overstated by as much as $1 million, and suggested that the reserves be reversed by that amount.

**30.** Nor are Plaintiffs' expert's conclusory statements sufficient to defeat summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir.1985); *see also In re Adobe Systems, Inc. Securities Litigation*, 787 F.Supp.

912, 919–920 (N.D.Cal. March 17, 1992) (expert's declaration cannot defeat summary judgment when evidence in record directs to the contrary).

**31.** During fiscal 1990, Toolworks entered into agreements under which it licensed to OEMs the right to reproduce and sell certain software developed by Toolworks and/or by other developers. Under these agreements, minimum amounts were payable to the company over periods generally not exceeding 24 months. Toolworks' revenue recognition policy was, and is, to recognize the minimum amounts due as revenue when the company fulfills its obligations under the related agreements, which occurs when the company has delivered software and related documentation to the OEM in reproducible form.

to Toolworks' OEM revenue recognition. After reviewing Toolworks' revenue recognition policy for OEM licensing revenues and clearing it with the SEC, Deloitte: (1) requested and reviewed the documentation supporting the recognition of the OEM revenue; (2) made extensive inquiries of and obtained specific written and oral representations from management; (3) confirmed in writing the timing, terms and minimum guarantee of every significant OEM transaction; (4) obtained a second written confirmation from Hyosung after an issue arose concerning the timing of that agreement; (5) obtained oral confirmation from five of the six large OEM customers which confirmed without exception that Toolworks had satisfied all of its obligation prior to March 31, 1990; (6) obtained and reviewed over thirty third-party licensing agreements; (7) confirmed Toolworks' right to sublicense software directly with Borland, a major supplier of software that Toolworks licensed to OEMs; (8) obtained and reviewed information concerning actual cash collections on the OEM agreements, showing that Toolworks had already collected over $3 million on the agreements by June 1990; and (9) performed subsequent events procedures. These procedures provided Deloitte with ample support for the audit conclusions it reached in the March 31, 1990 Financial Statements.[32] Plaintiffs' contention (primarily through their expert's declaration) that Deloitte should have performed further inquiries and investigations, arguing with the benefit of hindsight, does not establish that the aforementioned audit was reckless. *See Weinberger* at 98,255–56.[33] Nor does pointing out a few instances when bits of negative information were presented to Deloitte establish actual knowledge or recklessness. All audits result in the discovery of some adverse or inconsistent information which must be evaluated. Deloitte has shown that when

presented with negative information it investigated and acted upon it. The fact that on some occasions Deloitte concluded that the negative information presented was outweighed by contrary information might show bad judgment, but nothing Plaintiffs have put forth shows such an extreme departure from the standards of ordinary care that Deloitte "must have been aware" of the danger of misleading the public. *Hollinger*, 914 F.2d at 1569.[34]

#### b. Piper Jaffray & Hopwood

Plaintiffs claim that Deloitte partner Alan Frank made false representations about Toolworks to Robert Kleiber of Piper Jaffray & Hopwood, who Deloitte knew was disseminating investment recommendations concerning Toolworks stock, so that Mr. Kleiber could prepare a positive report on Toolworks prior to the Offering. Deloitte contends that this allegation has no basis. Mr. Kleiber testified that he requested the call, only discussed OEM revenue policy with Mr. Frank in general terms and did not discuss writing an investment article on Toolworks. Plaintiffs' only evidence to support their claim is Mr. Frank's deposition testimony, which says no more than that he spoke with Mr. Kleiber about OEM revenue policy in general terms. This is not enough to infer scienter.

### 2. *Secondary Liability*

#### a. Aiding and Abetting Allegations

 Aiding and abetting liability requires proof of: (1) an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the primary wrong and of his or her role in furthering it; (3) and substantial assistance in committing the wrong. *Jett v. Sunderman*, 840 F.2d 1487, 1495 (9th Cir.1988). Defendants' conduct may satisfy the substantial assistance requirement "even though ... [they] assisted in the scheme only by silence or inaction,"

---

**32.** Plaintiffs' objections to Alan Frank's declaration do not change this conclusion.

**33.** Plaintiffs' arguments that Deloitte should have performed all the audit steps it contemplated in its initial planning memorandum are also insufficient to establish scienter. *See supra* note 27.

**34.** Furthermore, the fact that Deloitte often reduced revenue recognition when it discovered negative information is inconsistent with scienter. *See Apple Computer*, 886 F.2d at 1118.

if they had a duty to disclose knowledge that would be material to investors. *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 188 (9th Cir.1987); *Strong v. France,* 474 F.2d 747, 752 (9th Cir.1973). Said duty to disclose arises from a "knowing assistance of or participation in a fraudulent scheme." *Harmsen v. Smith,* 693 F.2d 932, 944 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).[35]

Plaintiffs allege Deloitte is liable for aiding and abetting under Section 10(b) for: (1) assisting in including improper transactions in Toolworks' unaudited financial statements for the quarter ended June 30, 1990, (2) assisting in making fraudulent representations to the SEC, and (3) knowingly preparing and lending its name and reputation to Toolworks' Prospectus that contained false financial statements and other false statements.

### 1. *June 30, 1990 Quarter*

■ Plaintiffs allege that Toolworks' earnings press release and its Form 10–Q for the quarter ended June 30, 1990 ("June 30, 1990 Quarter Statements") were false and misleading. Deloitte contends that whether or not the June 30, 1990 Quarter Statements were false and misleading is irrelevant for purposes of aiding and abetting liability because Deloitte had no knowledge of and did not assist Toolworks in including allegedly improper transactions in the company's *unaudited* June 30, 1990 Quarter Statements.[36] Plaintiffs must present sufficient evidence that Deloitte knew and substantially assisted the alleged misconduct in order to support their aiding and abetting claims.

### a. Nintendo Sales to Distributors

Plaintiffs allege that Toolworks sold Nintendo cartridges to three distributors (Commtron, Capital Sales and Multi–Pal International) which were improperly included in Toolworks' revenue for the June 30 quarter because they were in some way contingent, non-final, or permitted a right of return. Deloitte contends that it did not review, approve, or otherwise participate in the company's decision to book these revenues, and that it did not know about these sales until after the class period. Plaintiffs respond that a consolidating trial balance and schedule of OEM revenues sent to Deloitte the day of or the day before Toolworks made its quarterly press release, "graphically illustrated that Toolworks' revenue and income [for the June 30, 1990 quarter] were phony." These documents, however, reflected what Toolworks reported in its unaudited June 30, 1990 Quarter Statements. They did not give any indication that the reported figures were "phony." Actual knowledge of the alleged fraud (primary wrong) cannot be inferred on Deloitte from these financial statements, particularly when Deloitte did not audit or review them.[37]

### b. Price Protection

Plaintiffs allege that Deloitte knew that Toolworks had granted price protection to Nintendo customers during the June 30, 1990 quarter, in violation of its revenue policy. Deloitte contends that it had no knowledge that Toolworks granted any price protection to any of its Nintendo customers during the June 30, 1990 quarter.[38] Plaintiffs do no more than argue that Deloitte should have done more audit work and that, if it had, it should have or would have learned about the price protection. This is not evidence that Deloitte knew of or substantially assisted the alleged fraudulent scheme.[39]

---

**35.** Negligent conduct does not satisfy Section 10(b) scienter. *Burgess v. Premier Corp.,* 727 F.2d 826, 832 (9th Cir.1984).

**36.** Deloitte did not audit Toolworks' quarterly financial statements, or perform a quarterly review or any other kind of verification function in connection with the June 30 quarter.

**37.** Nor is there any persuasive evidence to infer that Deloitte had actual knowledge of its role in furthering the alleged fraud or that Deloitte substantially assisted the fraud.

**38.** Deloitte notes that all Toolworks defendants have served sworn interrogatory answers admitting that they did not inform Deloitte that Toolworks had granted price protection to Nintendo customers.

**39.** *See supra* note 25 and text accompanying note 26.

### c. The Sony OEM Transaction

Plaintiffs allege that Toolworks improperly included $1.8 million in June 30, 1990 quarter revenue for an OEM transaction with Sony Corporation. Deloitte contends that it had no knowledge of any impropriety and that it did not assist Toolworks in booking this transaction.[40] Plaintiffs once again offer no more than an argument—*i.e.*, that Deloitte should have had a heightened concern regarding the recognition of any OEM revenue. As just noted, this is not evidence that Deloitte knew of or substantially assisted in the alleged fraudulent scheme.

### d. Reversal of Reserves

Plaintiffs allege that Deloitte knew of and participated in the reversal of reserves in order to manipulate Toolworks' June 30, 1990 quarter numbers. Deloitte contends it was not informed of and did not participate in Toolworks' decision to reverse June 30, 1990 reserves.[41] Plaintiffs respond that Deloitte should have discovered a discrepancy in the unaudited June 30, 1990 Quarter Statements that could have lead to the discovery that reserves had been reversed. This in no way rebuts the evidence presented by Deloitte that it had no knowledge of the reversal and that it did not substantially assist in it. Plaintiffs fail to establish their burden under *Celotex*.

### 2. SEC Letters

■ In late June and early July 1990, Toolworks' outside counsel, Riordan & McKinzie, sent a series of letters to the SEC responding to questions regarding the preliminary prospectus. Plaintiffs claim that these letters contained misrepresentations and omissions regarding two areas—(a) Toolworks' estimated revenues for the June 30, 1990 quarter, and (b) Toolworks' accounting for OEM licensing revenues—and that Deloitte aided and abetted the fraudulent scheme.

### a. The June Estimate

The only statement in the SEC letters relating to the June quarter estimates is in Riordan & McKinzie's letter of July 4, 1990. According to Deloitte, the estimates referred to in the letter were generated entirely by Toolworks; Deloitte did not generate, approve, or otherwise perform any testing procedures on Toolworks' estimates. Deloitte admits, however, that it suggested textual changes to the first sentence of the paragraph regarding estimates, but that the revision actually served to clarify the preliminary nature of Toolworks' estimate of its June quarter results.[42]

Plaintiffs do not dispute that the issue concerns one sentence, but argue that the change perpetrated a fraud on the SEC.[43] Plaintiffs contend that the language was changed at the urging of Deloitte because of the concern that the SEC would ask to see the preliminary financial data which showed that Toolworks had lost $420,000 through June 25, 1990, but "miraculously" generated nearly $2 million in revenues during the last five days of the quarter.

---

**40.** Both the CFO and the Controller of Toolworks have testified that they did not consult or discuss with Deloitte the propriety of booking revenue for the transaction.

**41.** All Toolworks officers who could remember participating in the decision to reverse the reserves have testified that Deloitte was not informed of and did not participate in Toolworks' decision.

**42.** The initial language of the first sentence of the draft letter provided:

"The preliminary financial data available to the Company for the recently-ended first quarter of fiscal 1991 is tentative and subject to receipt of substantial additional confirming data, particularly with respect to overseas transactions."

The final version of the letter sent to the SEC read:

"Preliminary financial data is not now available with regard to the Company's recently ended first quarter of fiscal 1991, as the Company is in the process of completing its quarterly financial statement closing procedures."

**43.** Plaintiffs argue, in addition to their sentence argument, that Deloitte aided and abetted a fraud by failing to disclose that Toolworks' June quarter estimates were incorrect. Deloitte, however, has established through direct and undisputed evidence that it did not generate, approve or otherwise test Toolworks' estimate. "Red flags" that should have alerted Deloitte to errors in the estimates cannot establish nor imply actual knowledge on the part of Deloitte.

**1508**

Plaintiffs, however, fail to provide sufficient evidence to support an aiding and abetting claim. They rely on testimony of Mr. Sylvester from Riordan & McKinzie, to support their claim that the change was made out of concern that the SEC would ask to see the preliminary financial data. But Mr. Sylvester's testimony only emphasizes Mr. Frank's concern that the SEC not be misled about the reliability of the preliminary information available to Toolworks, and that the letter be more "precisely and conservatively drafted." This does not imply actual knowledge or substantial assistance of a fraudulent scheme in this case. *See Apple Computer*, 886 F.2d at 1118.[44]

### b. OEM Accounting

Deloitte performed extensive procedures and investigations in connection with its audit of Toolworks' March 31, 1990 Financial Statements.[45] On that basis, Deloitte believed in good faith that the statements concerning OEM accounting in the letters sent to the SEC by Riordan & McKinzie were accurate. Plaintiffs point out, however, two aspects of Riordan & McKinzie's letter of July 1, 1990 which they claim is the basis for their aiding and abetting claim against Deloitte: (1) the substance of a model OEM agreement attached to the letter, and (2) the supposed failure to disclose information about the Craftsman transaction.

### 1. Model OEM Agreement

Plaintiffs allege that the July 1, 1990 letter to the SEC was drafted in large part by Deloitte and contained an attached model OEM agreement which was not representative of the actual OEM agreements.[46] Deloitte contends that it did not draft, approve or review the model OEM agreement that was attached to the July 1 letter.[47] Plaintiffs offer no evidence to the contrary. Plaintiffs need more than mere speculation to create an inference of actual knowledge and substantial assistance.[48]

### 2. Craftsman Transaction

Plaintiffs allege that the statements in the July 1, 1990 letter were inaccurate in light of the Craftsman transaction. Plaintiffs claim that the letter represented that "the OEM has an unconditional legal obligation to pay the Company the scheduled minimum amount due under the terms of the contract" and that "the Company does not grant price changes or concessions to OEM customers under any circumstances," although Deloitte knew that Toolworks had, in at least one instance, relieved an OEM customer (Craftsman) from a guaranteed minimum payment obligation for the 1990 fiscal year. Plaintiffs ignore, however, the history behind the Craftsman transaction. Deloitte had earlier determined that the Craftsman deal was improperly recorded, and approached Toolworks to make an adjustment to reverse the revenue booked on this sale. When Toolworks refused, Deloitte posted an entry for the entire amount of the revenue recognized on this sale to its Schedule of Adjustments Passed.[49] Deloitte then analyzed its aggregate passed adjustments and concluded

---

**44.** In addition, as Deloitte points out, Plaintiffs' theory makes little sense. While the final version of the letter said that "preliminary financial data" was not yet available, it also stated in the same paragraph that Toolworks' estimate was based on "the information presently available." Whether Toolworks' estimate was based on "preliminary financial data" or upon "information presently available" matters little; if the SEC had wanted to see the basis for Toolworks' estimate, it would have asked to see it under either version of the letter.

**45.** *See supra* text accompanying note 32.

**46.** Plaintiffs note that the model OEM agreement contained language stating that "in no event shall the OEM be relieved from any guaranteed minimum payment obligation," whereas

the actual OEM agreements under which Toolworks recognized revenue in the March 31, 1990 fiscal year contained no such language.

**47.** Deloitte provided Riordan with a rough first draft of certain portions of the letter; Deloitte's initial draft, however, was substantially rewritten by Riordan, which took responsibility for drafting the final language.

**48.** Plaintiffs also fail to establish a requisite primary violation. *See Jett*, 840 F.2d at 1495. This is perhaps indicative of the fact that their argument appears to be more a quibble with wording than an argument of substance.

**49.** This is the schedule of proposed adjustments which Toolworks declined to make.

that they did not have a material effect on the March 31, 1990 Financial Statements taken as a whole. This is precisely what Deloitte was supposed to do under generally accepted auditing standards ("GAAS").

■ Plaintiffs' aiding and abetting claim is based on the argument that it is a material misrepresentation to disclose a company's revenue recognition policy without also disclosing that there was an immaterial passed adjustment for a single transaction which failed to comply with that policy. This cannot be so. Every audit results in a certain number of passed adjustments which are not disclosed; these adjustments are passed as immaterial and accordingly require no disclosure. There is no indication that Deloitte did anything but follow this procedure in good faith; it cannot be held as an aider and abettor.

### 3. *Prospectus*

Plaintiffs claim that Deloitte should be held liable as an aider and abettor for certain alleged misrepresentations in the Prospectus. According to Plaintiffs, Deloitte knew about the false statements, but allowed use of its name in the Prospectus, thereby acquiring a duty to disclose facts that would be material to investors. Plaintiffs claim that pursuant to *Roberts v. Peat Marwick, Mitchell & Co.*, 857 F.2d 646 (9th Cir.1988), Deloitte's subsequent failure to correct the misstatements "substantially assisted" in the fraud.

■ The Ninth Circuit acknowledged in *Roberts* that accountants who *know* of an alleged violation, but allow use of its name

in offering memoranda despite that knowledge, may create a duty to disclose such information where the accountant's information is superior and the cost of disclosure to the accountant is minimal. *Id.* at 653. Plaintiffs must therefore establish knowledge on the part of Deloitte in order to create a possible duty of disclosure to satisfy the substantial assistance requirement.[50]

Plaintiffs allege Deloitte aided and abetted two misrepresentations in the Prospectus. Plaintiffs first claim that merely disclosing Toolworks' revenue recognition policy for OEM transactions was misleading because Toolworks allegedly recognized OEM revenue in contravention of its policy—*i.e.*, that Toolworks did not comply with its policy.[51] The Court has already found that there is no persuasive evidence of actual knowledge with respect to Plaintiffs' OEM revenue recognition claim against Deloitte.[52] Plaintiffs' first Prospectus aiding and abetting claim similarly fails for lack of scienter.

Plaintiffs also claim that the statement that "[c]urrently all sales of Nintendo products are final and the Company accepts the return of defective software cartridges" was false and misleading because contingent sales were made to three distributors in late June. Once again, the Court has already found that there is no persuasive evidence of actual knowledge with respect to contingent sales made to three distributors in late June 1990.[53] Plaintiffs' argument regarding unused draft Prospectus language does not alter this finding.[54]

---

**50.** *Roberts* does not, as Plaintiffs appear to contend, stand for the proposition that the use of Deloitte's name in the Prospectus is per se substantial assistance. Whether Deloitte "knew of and substantially assisted in the wrong depends on the circumstances." *Roberts*, 857 F.2d at 653 (citation omitted).

**51.** Plaintiffs do not contend, nor does the Court construe, this aiding and abetting claim as arguing that Toolworks' OEM revenue recognition policy was different from the policy described in the Prospectus. In fact, all the direct evidence in the record confirms that Toolworks' revenue recognition policy was accurately reflected in the Prospectus.

**52.** *See supra* Plaintiffs vs. Deloitte, Section I.A.1.a.4.

**53.** *See supra* Plaintiffs vs. Deloitte, Section I.A.2.a.1.a.

**54.** Plaintiffs argue that language to the effect that "it may be necessary for the Company to modify its return policy" was omitted from the Prospectus because Deloitte suggested that if the disclosure were made, Toolworks would have to establish Nintendo reserves. The evidence cited (Mr. Nate Cartell's testimony), however, does not imply scienter and is therefore insufficient to defeat summary judgment. Additionally, the omitted language was not material since the Prospectus did say that "[t]here can be no assur-

Plaintiffs' second Prospectus aiding and abetting claim also fails for lack of scienter.

### b. Conspiracy Allegations

■ Liability for conspiring to violate the federal securities laws requires "specific facts showing 'an agreement to participate in an unlawful act.'" June 18, 1991 Order at 9, 1991 WL 319033 (quoting *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1520 (N.D.Cal.1990)). Plaintiffs offer no evidence of an agreement by Deloitte to enter into a conspiracy with Toolworks. Plaintiffs instead offer speculative inferences that a conspiracy existed. This will not do. *See, e.g., Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) (speculative inferences of conspiracy will not help).

Summary judgement is therefore GRANTED in favor of Deloitte with respect to Plaintiffs' Section 10(b) claims.

### B. Section 11 Claims

■ Section 11 limits an accountant's liability to a statement in a registration statement "which purports to have been prepared or certified by him." 15 U.S.C. § 77k(a)(4). An accountant may therefore be held liable only for those statements "expressly attributed to the accountant" on the face of the registration statement. *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 643 (N.D.Cal.1980), *modified on other grounds*, 581 F.Supp. 878 (N.D.Cal.1984).[55] Here, the only statement attributed to Deloitte in the Prospectus is Deloitte's audited March 31, 1990 Financial Statements. Deloitte is accordingly liable under Section 11 for any material misrepresentations or omissions in the March 31, 1990 Financial Statements, unless it establishes an affirmative due diligence defense. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983).

Deloitte seeks summary judgment on Plaintiffs' Section 11 claims against it primarily on the issue of due diligence.[56] It claims that the investigation performed in connection with the March 31, 1990 Financial Statements entitles it to the "due diligence" defense. *See id.;* 15 U.S.C. § 77k(b)(3)(B). Plaintiffs respond that Deloitte cannot establish a due diligence defense because there is substantial evidence that Deloitte failed to perform a reasonable investigation into (1) Toolworks' Nintendo business, (2) Toolworks' Mindscape business, and (3) recognition of revenues on Toolworks' OEM software licensing business.[57]

■ Section 11 requires a "reasonable" investigation by accountants. 15 U.S.C. § 77k(b)(3). This means that accountants are expected to investigate, to various degrees, facts supporting and contradicting inclusions in registration statements. They must undertake that investigation which a reasonably prudent man in that position would conduct. *See Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544 (E.D.N.Y.1971); *see also Escott v. Barchris Construction Corp.*, 283 F.Supp. 643, 703 (S.D.N.Y.1968) (accountants held to standards of their own profession, GAAS). If accountants establish a reasonable investigation under the circumstances of the case, they are entitled to the statutory due diligence defense.

### 1. *Nintendo Business*

The Court has found that Plaintiffs have failed to offer any admissible evidence of a

---

ances that the Company will not be subject to product returns in the future." Prospectus at 8.

**55.** *Cf. Ahern v. Gaussoin*, 611 F.Supp. 1465, 1483 (D.Or.1985) (subsequent events up to effective date of registration statement are relevant to show that financial statement was false or that it had become misleading).

**56.** Deloitte also seeks summary judgement on grounds of lack of materiality on certain issues. Deloitte's materiality arguments will be addressed where appropriate.

**57.** This Court has found that there is no evidence of scienter on the record to support Plaintiffs' Section 10(b) claims with respect to Toolworks' Nintendo business, Toolworks' Mindscape business, and recognition of revenues on Toolworks' OEM software licensing business. Section 11 liability, however, does not require proof of scienter; liability "may lie for wholly negligent conduct." *Straus v. Holiday Inns, Inc.*, 460 F.Supp. 729, 732 (S.D.N.Y.1978).

*material* misrepresentation or omission in the March 31, 1990 Financial Statements with respect to Toolworks' Nintendo business.[58] Plaintiffs accordingly fail to establish their burden under *Celotex* for a Section 11 claim.

### 2. *Mindscape Software*

Plaintiffs allege two general misrepresentations in the March 31, 1990 Financial Statements with respect to Mindscape Software: (1) the improper inclusion of Mindscape royalty advances and guarantees in revenues; and (2) the improper inclusion of obsolete Mindscape computer software in inventory, resulting in an inventory reserve which should have been higher than stated. The Court has found that Plaintiffs have failed to offer any admissible evidence of a material overstatement with respect to royalty advances and guarantees,[59] and accordingly now finds that Plaintiffs also fail to establish their *Celotex* burden here.

Plaintiffs' inventory claim also suffers from the same infirmity. Plaintiffs contend that Deloitte's decision to report a 44% reserve was improper, without putting forth any evidence that a 44% reserve resulted in a material overstatement of Mindscape inventory. Plaintiffs cannot defeat summary judgment without producing "specific facts" to establish an essential element of their claim. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

### 3. *OEM Revenue Recognition*

■ The Court has found that Deloitte performed a scienter-free audit with regards to Toolworks' OEM revenue recognition.[60] This alone does not, however, establish a Section 11 due diligence defense. Whether an auditor performed a reasonable investigation is inextricably tied to compliance with its professional standards, including GAAS and generally accepted accounting principles ("GAAP"). *See Escott v. Barchris Construction Corp.,* 283 F.Supp. at 703. Failure to comply with GAAS, GAAP and ordinary care, even where an otherwise scienter-free audit was performed, may result in Section 11 liability. *See Straus v. Holiday Inns, Inc.,* 460 F.Supp. 729, 732 (S.D.N.Y.1978) (Section 11 liability "may lie for wholly negligent conduct."). Deloitte must establish that it performed a reasonable investigation under the circumstances in order to receive summary judgment on the Section 11 OEM revenue recognition claim.

In order for the Court to find due diligence as a matter of law, there must be no genuine issues of material historical fact in dispute. After a careful review of the record, the Court finds that there are genuine issues of material historical fact with regards to Deloitte's OEM revenue recognition due diligence. The record, for example, is replete with disputed facts regarding whether GAAS and GAAP procedures were followed by Deloitte in its OEM revenue recognition audit. Such genuine issues of material historical fact preclude summary judgment.[61]

Summary judgment is therefore GRANTED in favor of Deloitte as to Plaintiffs' Section 11 claims regarding Toolworks' Nintendo business and Mindscape Software, and DENIED as to Plaintiffs' Section 11 claims regarding Toolworks' OEM revenue recognition.

## II. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs move for summary judgment as to Section 11 and 10(b) liability on three

---

**58.** *See supra* Plaintiffs vs. Deloitte, Section I.A.1.a.1. The Court further found that with respect to Plaintiff's claim regarding sales to three Nintendo distributors, Plaintiffs offer no evidence to establish that the sales took place in fiscal 1990 or are reflected in Toolworks' audited March 31, 1990 Financial Statements. *See id.* at Section I.A.1.a.1.b.

**59.** *See supra* Plaintiffs vs. Deloitte, Section I.A.1.a.3.

**60.** *See id.* at Section I.A.1.a.4.

**61.** By contrast, summary judgment is appropriate for the Underwriters since there are no genuine issues of material historical fact with regard to the due diligence they performed; instead, the disagreement there is as to whether the due diligence performed entitles the Underwriters to a statutory defense as a matter of law. *See* Plaintiffs v. Underwriters, Section I.A.1. It is not the merits of the defense that separate the Underwriters from Deloitte; rather, it is the fact/law distinction.

issues: (1) the alleged misrepresentations concerning OEM revenue in the March 31, 1990 Financial Statements, (2) Deloitte's alleged failure to perform standard audit procedures with respect to the OEM and Nintendo businesses, and (3) Deloitte's alleged active participation in making fraudulent misrepresentations to the SEC concerning OEM licensing recognition revenue.

After this Court's rulings on Deloitte's motion for summary judgment, the only undecided claims in Plaintiffs' motion are Plaintiffs' Section 11 claims with respect to Toolworks' OEM revenue recognition. As set above, however, these claims are unsuited for summary judgment since they contain genuine issues of material fact.

Plaintiffs' motion for partial summary judgment is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the Court hereby rules as follows:

1. Underwriters' motion for summary judgment on all claims against them is hereby GRANTED;

2. Plaintiffs' motion for partial summary judgment against the Underwriters as to liability on Plaintiffs' Section 11 and 12(2) claims is hereby DENIED;

3. Deloitte's motion for summary judgment on all claims against them is hereby DENIED. Deloitte's motion for partial summary judgment as to Section 11 and 10(b) claims against it is hereby GRANTED IN PART AND DENIED IN PART as follows:

a. Deloitte's motion for partial summary judgment on Plaintiffs' Section 10(b) primary liability claims is hereby GRANTED;

b. Deloitte's motion for partial summary judgment on Plaintiffs' Section 10(b) aiding and abetting claim is hereby GRANTED;

c. Deloitte's motion for partial summary judgment on Plaintiffs' Section 10(b) conspiracy claim is hereby GRANTED;

d. Deloitte's motion for partial summary judgment on Plaintiffs' Section 11 claims is hereby GRANTED as to Toolworks' Nintendo business and Mindscape Software claims and DENIED as to Toolworks' OEM revenue recognition claim;

4. Plaintiffs' motion for partial summary judgment against Deloitte as to liability on Plaintiff's Section 11 and 10(b) claims is hereby DENIED.

SO ORDERED.